900 F.2d 852
 58 USLW 2693, 22 Collier Bankr.Cas.2d 1770,
21 Bankr.Ct.Dec. 641, Bankr. L. Rep. P 73,393
 MCORP FINANCIAL, INC., MCorp Mgt. and MCorp, Plaintiffs-Appellees,
and
Official Creditors' Committee of MCorp, MCorp Financial,
Inc., and MCorp Mgt., Intervenors-Appellees,
v.
BOARD OF GOVERNORS FEDERAL RESERVE SYSTEM OF the UNITED
STATES of America, Defendant-Appellant.
 No. 89-2816.
 United States Court of Appeals,
Fifth Circuit.
 May 15, 1990.
 
 Jeffrey Clair, William Kanter, Asst. Attys. Gen., Dept. of Justice, Civil Div., Washington, D.C., for defendant-appellant.
 Alan B. Miller, Harvey R. Miller, D.J. Baker, Weil, Gotsal & Manges, New York City, Howard N. Cayne, Arnold & Porter, Washington, D.C., for MCorp., et al.
 Robert J. Rosenberg, Latham & Watkins, New York City, John P. Lynch, Deborah Corthier Paskin, Latham & Watkins, Chicago, Ill., for Official Creditors', et al.
 Appeal from the United States District Court for the Southern District of Texas.
 Before GARZA, WILLIAMS and DAVIS, Circuit Judges.
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 The Board of Governors of the Federal Reserve appeals an order of the district court, sitting in bankruptcy, enjoining the Board from pursuing its enforcement actions against MCorp without district court approval. 101 B.R. 483. Because the Board's source of strength proceedings exceed its statutory authority, we remand with instructions to enjoin the Board from further prosecution of these charges. Because the district court lacks subject matter jurisdiction to enjoin the Board's actions on the remaining charges, we vacate the injunction as to these charges.
 
 I.
 
 2
 In October 1988, the Board of Governors of the Federal Reserve (the Board), the primary regulator for bank holding companies, issued a notice of charges and of hearing against MCorp, a Texas-based bank holding company. The Board alleged that MCorp was engaging in unsafe and unsound practices, "likely to cause substantial dissipation of the assets of MCorp that could be used to allow MCorp to serve as a source of financial strength for the subsidiary Banks." A week later the Board issued an Amended Notice of Charges, which sought, among other things, to require MCorp to "implement[ ] an acceptable capital plan that would ensure that all of MCorp's available assets are used to recapitalize the Subsidiary Banks that are suffering capital deficiencies." MCorp's subsidiary banks were suffering heavy losses from real estate and energy loans.
 
 
 3
 In March 1989, three creditors of MCorp commenced an involuntary bankruptcy proceeding against MCorp in the U.S. Bankruptcy Court for the Southern District of New York. The Comptroller of the Currency (OCC), the primary regulator for national banks, subsequently declared a total of twenty of MCorp's subsidiary banks (MBanks) insolvent; OCC appointed the Federal Deposit Insurance Corporation (FDIC) as receiver, divesting MCorp of control of these banks. MCorp was left with five banks. MCorp and two of its subsidiaries, MCorp Financial and MCorp Management then filed voluntary Chapter 11 bankruptcy petitions in the U.S. Bankruptcy Court for the Southern District of Texas. The bankruptcy proceedings against MCorp and its subsidiaries (hereafter collectively referred to as MCorp) were consolidated into one jointly administered proceeding in the Texas forum.
 
 
 4
 In March 1989, by notice of charges and hearing the Board also commenced further administrative proceedings against MCorp. The March charges accused MCorp and MCorp management of violations of Sec. 23A of the Federal Reserve Act, alleging MCorp caused MBank Houston and MBank Preston, two of the closed banks, to provide MCorp management "unsecured extensions of credit." In late May the Board issued a second amended notice of charges, relating to the October notice of charges, alleging that MCorp had failed to act as a source of financial strength to its remaining subsidiary banks.
 
 
 5
 MCorp initiated an adversary proceeding against the Board in May 1989, and filed an Emergency Motion for a TRO and preliminary injunction, seeking to enjoin the Board from prosecuting its administrative proceedings against the debtors, and from initiating further administrative proceedings against the debtors without prior approval of the bankruptcy court. The bankruptcy court denied the TRO request. The Board moved the district court to withdraw the reference of the adversary proceeding to the bankruptcy court. The district court granted the Board's motion and placed the case on its own docket.
 
 
 6
 In June 1989, the district court entered a preliminary injunction granting the relief sought by the debtors. The district court preliminarily enjoined the Board from prosecuting its pending administrative proceedings and
 
 
 7
 using its authority over bank holding companies or banks to attempt to effect, directly or indirectly, a reorganization of the MCorp group or its components or to interfere, except through participation in the bankruptcy proceedings, with the restructuring being developed in the bankruptcy proceeding.
 
 
 8
 The district court stated that the preliminary injunction left completely unaffected the Board's "general execution, supervisory and examination duties of the operations of MCorp and its bank subsidiaries and ... central bank duties as they affect MCorp in common with all other institutions." The court established a procedure for future Board proceedings, where the Board was first required to present to MCorp any new administrative proceedings, notices of charges or temporary cease and desist orders before their issuance. If the Board and MCorp could not agree whether a proposed proceeding was subject to the preliminary injunction, the Board could then present that issue to the district court. If the court decided the Board's proposed action related to the banks' "operations," the court proposed to exempt this action from the restraint of the preliminary injunction; if however the Board's proposed action affected the reorganization, the district court proposed to stay this action in deference to the bankruptcy court.
 
 
 9
 The Board appealed the preliminary injunction to this court.
 
 II.
 A.
 
 10
 The Board contends first that the district court, sitting in bankruptcy, has no jurisdiction to enjoin the Board's prosecution of its administrative actions, because of 12 U.S.C. Sec. 1818(i) (the Financial Institutions Supervisory Act of 1966 (FISA) as amended), which provides:
 
 
 11
 except as otherwise provided in this section no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order.
 
 
 12
 As we stated in Groos National Bank v. Comptroller of Currency, 573 F.2d 889 (5th Cir.1978), "section 1818(i) in particular evinces a clear intention that this regulatory process is not to be disturbed by untimely judicial intervention, at least where there is no 'clear departure from statutory authority.' " Id. at 895, quoting Manges v. Camp, 474 F.2d 97, 99 (5th Cir.1973). Thus, under 12 U.S.C. Sec. 1818(h) and the Administrative Procedure Act (APA), a bank holding company is not ordinarily entitled to judicial review until the Board issues a final order.
 
 
 13
 MCorp's principal argument that the district court properly exercised subject matter jurisdiction is predicated on 28 U.S.C. Secs. 1334(b) and (d). MCorp argues that these sections of the Bankruptcy Code effectively supersede the Board's exclusive jurisdiction under Sec. 1818(i)(1) to prosecute its enforcement actions, and therefore empower the court to enjoin prosecution of those actions. The district court presumably agreed and concluded that Sec. 1818(i) conflicted with Secs. 1334(b) and (d) of the Bankruptcy Code.
 
 Section 1334(b) provides:
 
 14
 Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.
 
 
 15
 The plain language of Sec. 1334(b) does not purport to give the district court exclusive jurisdiction over matters arising under Title 11 to the exclusion of administrative agencies; rather, Sec. 1334(b) grants the district court concurrent jurisdiction over matters that otherwise would lie within the exclusive jurisdiction of another court.
 
 
 16
 The legislative history of Sec. 1334(b) also supports the view that the section was intended to prevent another court from exercising exclusive jurisdiction over a matter brought within the Bankruptcy Code. The Commission on the Bankruptcy Laws of the United States, quoted at length in the House Judiciary Committee report, stated that "[the] first and most important objection to the present dispensation is the division of labor between the bankruptcy court and other courts." H.R.Rep. No. 595, 95th Cong., 1st Sess. 43 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6005. Under the prior bankruptcy law, the jurisdiction of the bankruptcy court was limited by the concepts of possession and consent. The House report adopted the reasoning of the Commission that the old law was undesirable because of "the frequent, time-consuming, and expensive litigation of the question whether the bankruptcy court has jurisdiction of a particular proceeding." Id. at 45, U.S.Code Cong. & Admin.News 1978, p. 6007. Under the prior jurisdictional scheme, " 'When a "summary" proceeding in the bankruptcy court is appropriate and when a plenary suit is required is one of the most involved and controversial questions in the entire field of bankruptcy,' " the Committee observed. Id. at 45, U.S.Code Cong. & Admin.News 1978, p. 6007. We are persuaded therefore that it was this division of jurisdiction between bankruptcy courts and other courts which the jurisdictional changes of the new law were intended to address.
 
 
 17
 MCorp argues that the legislative history explains that Sec. 1334(b) grants bankruptcy courts pervasive jurisdiction over all matters and proceedings that arise in or in connection with bankruptcy cases. Yet the legislative history reflects no intent that the bankruptcy court's jurisdiction supersede the exclusive jurisdiction of an administrative agency, or reinvest the courts with jurisdiction barred by Sec. 1818.
 
 
 18
 In holding that Sec. 1334 superseded Sec. 1818(i), the district court did not harmonize the two statutes, but effectively repealed Sec. 1818(i), and negated its basic sense and purpose of preventing early interference with administrative proceedings. This interpretation invested the district court, sitting in bankruptcy, with equitable power withheld from every other court by the language of Sec. 1818(i). Implied repeals are highly disfavored, and one statute will not be considered to impliedly repeal another unless there is a "positive repugnancy" between the two. Tennessee Valley Authority v. Hill, 437 U.S. 153, 189-90, 98 S.Ct. 2279, 2299-2300, 57 L.Ed.2d 117 (1978). We find no such irreconcilable conflict here. As the Supreme Court has stated:
 
 
 19
 The "plain purpose" of legislation ... is determined in the first instance with reference to the plain language of the statute itself. Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises.
 
 
 20
 Board of Governors v. Dimension Financial Corp., 474 U.S. 361, 373-74, 106 S.Ct. 681, 688-89, 88 L.Ed.2d 691 (1986) (citation omitted).
 
 
 21
 MCorp further contends that courts consistently have held that the phrase in Sec. 1334(b), "[notwithstanding] any act of Congress that confers exclusive jurisdiction on [any other] court," was expressly intended to confer on the bankruptcy courts jurisdiction over all matters related to a debtor's Chapter 11 case, including administrative proceedings, citing In re Casey Corp., 46 B.R. 473 (S.D.Ind.1985), and In re Shelby County Healthcare Services of Al., Inc., 80 B.R. 555 (N.D.Ga.1987). The district court relied in part upon Casey in holding that Sec. 1334 superseded the jurisdictional bar of Sec. 1818(i). These cases are not binding upon this court, however, nor do we find their reasoning persuasive as to the issue before us.
 
 
 22
 MCorp argues next that the bankruptcy court has exclusive jurisdiction over the Board's enforcement proceeding based on Sec. 1334(d), which provides:
 
 
 23
 The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate. (emphasis added).
 
 
 24
 According to MCorp, because the bankruptcy court has exclusive control of MCorp's assets, it necessarily follows from the above section that the Board had no jurisdiction over MCorp. But the Board has not sought control over the property of MCorp's estate in this action, only the opportunity to go forward in its administrative proceedings. Nor at this early stage do we find the Board's enforcement actions to be sham proceedings, brought as a means of controlling the debtor's assets. We therefore do not consider Sec. 1334(d) to grant the district court exclusive jurisdiction here.
 
 
 25
 MCorp relies on In re Modern Boats, Inc., 775 F.2d 619 (5th Cir.1985), and In re Louisiana Ship Management, Inc., 761 F.2d 1025 (5th Cir.1985), to support its argument. Louisiana Ship Management and Modern Boats both involved in rem proceedings in admiralty where vessels were under seizure. We held that once a chapter 11 petition was filed, the court where that petition was filed enjoyed exclusive jurisdiction over the vessels subject to a maritime lien and that the admiralty court had no jurisdiction over the property. MCorp's reliance on these cases is misplaced because the Board's proceedings do not directly concern the debtor's property.
 
 
 26
 MCorp also argues that because the above Bankruptcy Code provisions were enacted after Sec. 1818, and do not exempt bank holding company administrative actions from the comprehensive jurisdiction of the bankruptcy court, Congress must have intended no such exemptions. MCorp contends that this is especially true in view of the express exemption granted banks from recourse to bankruptcy protection in Sec. 109 of the Bankruptcy Code. Absent some clear intention to the contrary, however, a specific statute will not be controlled by a general one regardless of the priority of enactment. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). Congress revealed no intent to supersede the specific jurisdictional bar of Sec. 1818(i) in the legislative history of the Bankruptcy Reform Act, nor in the recently enacted Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, 103 Stat. 183. We decline to imply any affirmative powers to the bankruptcy court from Congress' failure to act in this area.
 
 
 27
 In analogous circumstances, several circuits have held that the automatic stay provisions of the Bankruptcy Code in the case of a bankrupt employer do not supersede the anti-injunction provision of the Norris-LaGuardia Act, which precludes courts from enjoining union conduct. In In Re Crowe & Associates, Inc., 713 F.2d 211, 214-16 (6th Cir.1983), the Sixth Circuit concluded that the legislative history of the Bankruptcy Reform Act was silent as to the anti-injunction provisions of the Norris-LaGuardia Act, and this silence was "self-evident proof that Congress never intended to supersede or transcend [the Norris-LaGuardia Act], since we cannot believe that the Norris-LaGuardia Act was to be superseded sub silentio." Id. at 215, quoting In re Petrusch, 667 F.2d 297, 300 (2d Cir.1981); see also Briggs Transportation Co. v. International Brotherhood of Teamsters, 739 F.2d 341, 343 (8th Cir.1984) ("the parties have cited us to nothing in the Bankruptcy Code or its legislative history indicating a congressional intent to lift the jurisdictional restrictions of the Norris-LaGuardia Act").
 
 
 28
 The Board also relies on Becker's Motor Transportation, Inc. v. Needham's Motor Service, Inc., 632 F.2d 242 (3d Cir.1980), cert. denied, 450 U.S. 916, 101 S.Ct. 1358, 67 L.Ed.2d 341 (1981), in which the court held independent statutory provisions barring any suit to restrain the assessment or collection of taxes deprived the bankruptcy court of the authority to enter an injunction against the government's tax collection efforts. In reaching this conclusion the Third Circuit in Becker's Motor distinguished Bostwick v. United States, 521 F.2d 741 (8th Cir.1975), a tax injunction case relied upon by MCorp and the lower court in which the Eighth Circuit reached the contrary result. The court in Becker's Motor concluded that the Bostwick court created a judicial exception to the tax anti-injunction statute in contravention of clear congressional intent. Becker's Motor, 632 F.2d at 246. We agree with the Third Circuit that absent clear congressional intent any argument for permitting the bankruptcy court's jurisdiction to supersede existing anti-injunction legislation should be addressed to Congress, and we will not imply the repeal of such legislation.
 
 
 29
 For the above reasons, we conclude that the plain language of Sec. 1818(i) deprives the district court of jurisdiction to enjoin the Board's administrative proceedings if the Board's actions do not exceed the authority Congress granted to it. We turn next to MCorp's argument that the Board is exceeding its statutory authority.
 
 B.
 
 30
 MCorp asserts that the Board lacks authority to proceed against banks in FDIC receivership, that the Board's self-dealing charges are a pretext for avoiding the exclusive jurisdiction of the bankruptcy court over MCorp's assets, and that the Board's source of strength policy is without statutory authority.
 
 
 31
 In Manges v. Camp, 474 F.2d 97 (5th Cir.1973), we recognized that the statute at issue here, Sec. 1818, that withdraws the jurisdiction of the court in deference to an agency, is not effective when the agency exceeds its authority under that statute. There is "a very strong court created exception to withdrawal statutes. This exception comes into play when there has been a clear departure from statutory authority, and thereby exposes the offending agency to review of administrative action otherwise made unreviewable by statute." Manges, 474 F.2d at 99. If the Board's proceedings exceed its statutory authority, we may review the Board's action prior to a final order despite the jurisdictional bar of Sec. 1818; if the Board "was not acting within [the] authority granted by Congress, then 12 U.S.C. Sec. 1818(i) could not withdraw jurisdiction." Manges, 474 F.2d at 99.
 
 
 32
 The Supreme Court established this exception in Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). In Leedom the Court found district court review proper, despite an express preclusion provision, where the National Labor Relations Board had acted in excess of its delegated powers.
 
 
 33
 The Court stated in Leedom that "[t]his suit is not one to 'review,' in the sense of that term as used in the [National Labor Relations] Act, a decision of the [National Labor Relations] Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers...." Leedom, 358 U.S. at 188, 79 S.Ct. at 183. The D.C. Circuit recently characterized the Leedom rule as one permitting a court in the face of a withdrawal statute to determine "whether an agency has acted 'in excess of its delegated powers' " and "whether the agency action 'on its face' violated a statute." Dart v. United States, 848 F.2d 217, 222 (D.C.Cir.1988). See Coit Independence Joint Venture v. Federal Sav. & Loan Ins. Corp., --- U.S. ----, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989); Breen v. Selective Service Local Board, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970); Oestereich v. Selective Service System Local Board, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968). Cf. Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 680 n. 11, 106 S.Ct. 2133, 2141 n. 11, 90 L.Ed.2d 623 (1986).
 
 
 34
 MCorp argues that the Board exceeded its authority in three respects because it has no authority to (1) regulate MCorp's relationships with former MBanks, now under FDIC receivership, which are the subject of the administrative proceedings; (2) assist the FDIC, as receiver of the closed MBanks, to obtain damages under the pretext of punishing MCorp for violations of Sec. 23A of the Federal Reserve Act,[1] which concerns self-dealing among holding company subsidiaries; and (3) compel a bank holding company to transfer its funds to subsidiary banks.
 
 
 35
 MCorp argues first that the Board lacks authority to regulate MCorp's relationships with former subsidiary banks now under FDIC receivership. Both the "source of strength" charges and the self dealing charges, as initially set out by the Board, were levelled in part to the relationship between MCorp and MBanks which were later closed and placed under FDIC receivership. We are persuaded that the Board is at least entitled to make a determination on the legitimacy of the credit transaction with the closed banks at issue to allow it to evaluate what remedy it wants to pursue against MCorp. Certainly the Board's attempt to do that is not facially invalid.
 
 
 36
 MCorp next argues that the Board's Sec. 23A proceeding is simply an attempt to assist the FDIC to obtain MCorp's property under the guise of remedying a violation of Sec. 23A of the Reserve Act. We disagree. The Board is well within its authority in seeking an order against MCorp to cease and desist any transactions which violate the provisions of Sec. 23A, or "to take affirmative action" as may be appropriate. 12 U.S.C. Sec. 1818(b)(1). The notice of charges relating to the appropriateness of the credit transactions between an MCorp nonbank subsidiary and two of MCorp's former subsidiary banks is not on its face a sham proceeding initiated only to assist the FDIC to collect damages; at least a fact issue is presented on the merits of the Sec. 23A charges. The mere prosecution of the charges before the Board does not in itself disturb the bankruptcy court's alleged exclusive jurisdiction over MCorp's property under Sec. 1334(d).
 
 
 37
 We are persuaded, however, that a serious legal issue is presented as to whether the Board has statutory authority to pursue its source of strength charges. Before turning to that problem, we address a threshold argument of the Board that we are precluded from considering the Board's authority to proceed.
 
 
 38
 The Board contends that MCorp may not judicially challenge at this stage the Board's authority to proceed with its charges because MCorp has not exhausted its administrative remedies. The Board relies on Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938), in which the Court stated that "[j]udicial relief is not normally available for supposed or threatened injury until the prescribed administrative remedy has been exhausted." Id. at 50, 58 S.Ct. at 463.
 
 
 39
 Myers did not present a challenge to the agency's authority to act on the complaint presented to it. The petitioning employer factually challenged the interstate nature of the employer's business, one of the elements of the NLRB's charge. The Court concluded that this factual determination should be made by the NLRB. The Supreme Court held that a federal district court is without jurisdiction to enjoin the NLRB from "hearing and determining what Congress declared the [National Labor Relations] Board should hear and determine in the first instance." Id. at 50-51, 58 S.Ct. at 463-464 (footnote omitted).
 
 
 40
 The question of the Board's authority to impose its source of strength requirement is quite a different issue. No facts are in dispute. The sole question presented is a legal one: whether the Board has authority to order a holding company to transfer its funds to its troubled subsidiary banks. The Board has instituted proceedings to require the holding company to transfer those funds. The legal issue of the Board's authority can be resolved without further factual development. "[P]rompt resolution will eliminate uncertainty and be in the interest of efficient judicial administration." Indep. Bankers Ass'n v. Heimann, 613 F.2d 1164, 1167 (D.C.Cir.1979), cert. denied, 449 U.S. 823, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980). Because we conclude that MCorp is not required to exhaust its administrative remedies in this circumstance, we turn to the merits of whether the Board has authority to require the holding company to transfer its funds to troubled subsidiary banks.
 
 
 41
 The Board contends it has authority to issue the source of strength charges under Secs. 1818(b)(1) and (3), which empower it to file charges against a bank holding company which the Board believes (1) has violated or is about to violate a "law, rule or regulation"; or (2) is engaging in an "unsafe or unsound" practice.[2] The Board contends that MCorp has failed to act as a source of strength for its bank subsidiaries in violation of the Board's regulations and policy statements. The Board also contends that this failure constitutes an unsafe or unsound practice in violation of Sec. 1818.[3]
 
 
 42
 We consider first whether the authority the Board assumed under its regulation and policy statement exceeds its statutory grant. The Bank Holding Company Act of 1956 (BHCA), 12 U.S.C. Sec. 1841 et seq., grants the Board supervisory control over the formation, structure and operation of bank holding companies and their nonbank subsidiaries. Section 3(a) of the Act, 12 U.S.C. Sec. 1842(a), provides that no company may acquire control of a bank without prior approval by the Board. In determining whether to approve an application, Sec. 3(c) of the Act, 12 U.S.C. Sec. 1842(c), directs the Board to consider "the financial and managerial resources and future prospects of the company or companies and the banks concerned."[4]
 
 
 43
 * * *
 
 
 44
 In 1984, as part of its comprehensive revision of Regulation Y, the Board added 12 C.F.R. Sec. 225.4(a)(1), which provides:
 
 
 45
 Sec. 225.4 Corporate practices.
 
 
 46
 (a) Bank holding company policy and operations. (1) A bank holding company shall serve as a source of financial and mangerial strength to its subsidiary banks and shall not contuct [sic] its operations in an unsafe or unsound manner.
 
 
 47
 Revision of Regulation Y, 49 Fed.Reg. 820 (1984) (codified at 12 C.F.R. Sec. 225.4(a)(1)).
 
 
 48
 In April 1987, the Board published a policy statement in the Federal Register, which further provided:
 
 
 49
 It is the policy of the Board that in serving as a source of strength to its subsidiary banks, a bank holding company should stand ready to use available resources to provide adequate capital funds to its subsidiary banks during periods of financial stress or adversity and should maintain the financial flexibility and capital-raising capacity to obtain additional resources for assisting its subsidiary banks....
 
 
 50
 A bank holding company's failure to meet its obligation to serve as a source of strength to its subsidiary bank(s), including an unwillingness to provide appropriate assistance to a troubled or failing bank, will generally be considered an unsafe and unsound banking practice or a violation of Regulation Y, or both....
 
 
 51
 Policy Statement, 52 Fed.Reg. 15707, 15708 (1987) (emphasis added). This policy statement was effective April 24, 1987. The Board solicited comments on the policy, with a view to revising the statement in light of such comments. No subsequent revision has been published.
 
 
 52
 The Board also relies on the broad language of Sec. 5(b) of the BHCA, 12 U.S.C. Sec. 1844(b), for authority to issue the above regulation and policy statement. Section 5(b) states:
 
 
 53
 The Board is authorized to issue such regulations and orders as may be necessary to enable it to administer and carry out the purposes of this chapter and prevent evasions thereof.
 
 
 54
 The Board finds support for its authority to enforce its source of strength requirements in Board of Governors v. First Lincolnwood Corp., 439 U.S. 234, 99 S.Ct. 505, 58 L.Ed.2d 484 (1978). In this case the Court considered whether the BHCA authorized the Board to disapprove an application of a proposed bank holding company solely on grounds of financial unsoundness, and in the absence of any anticompetitive effects resulting from the transaction. The Supreme Court answered this question in the affirmative and upheld the Board's rejection of a proposed holding company's application. This holding was based on the statutory language of 12 U.S.C. Sec. 1842(c), as well as the legislative history of the BHCA. The Supreme Court stated:
 
 
 55
 The language of the statute supports the Board's interpretation of Sec. 3(c) as an authorization to deny applications on grounds of financial and managerial unsoundness even in the absence of any anticompetitive impact. Section 3(c) directs the Board to consider the financial and managerial resources and future prospects of the applicants and banks concerned "[i]n every case," not just in cases in which the Board finds that the transaction will have an anticompetitive effect.
 
 
 56
 Id. at 243, 99 S.Ct. at 510.
 
 
 57
 In response to the court of appeals' holding that the Board's authority to deny an application because of unsound financial or managerial consideration was limited to instances in which the unsoundness was caused or exacerbated by the proposed transaction, the Court stated:
 
 
 58
 Indeed, the Court of Appeals' construction of the statute would require the Board to approve formation of a bank holding company with corrupt management simply because management would become no more corrupt by virtue of the transaction. We hesitate to adopt a construction that would yield such an anomalous result.
 
 
 59
 Id. at 250, 99 S.Ct. at 514.
 
 
 60
 Finally, addressing the arguments of the dissent, the Court stated that its holding was not intended to extend the Board's authority to day-to-day supervision of banks, but allowed the Board to disapprove an application to prevent the formation of an unsound holding company.
 
 
 61
 In the dissent's view, the Board, by looking beyond the transaction before it, attempted to exercise the day-to-day regulatory authority over banks which Congress denied to it and conferred on the Comptroller. We disagree with the basic premise of the dissent's argument. As the Board found, the effect of this transaction would have been the formation of a financially unsound bank holding company. Thus, the Board's attempt to prevent this effect and to induce respondent to form an enterprise that met the Board's standards of financial soundness was entirely consistent with the language the dissent cites.
 
 
 62
 Id. at 252 n. 18, 99 S.Ct. at 515 n. 18 (emphasis added). In First Lincolnwood, therefore, the Court relied upon the express provisions of Sec. 3(c) that required the Board to consider financial soundness of the subsidiary bank in determining whether to approve a holding company's application. The Court made it clear that it did not read the BHCA to grant the Board authority to regulate the day-to-day financial soundness of the subsidiary banks.
 
 
 63
 The Supreme Court in Board of Governors v. Dimension Financial Corp., 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986), considered whether the Board exceeded its authority in expanding certain definitions in Regulation Y. The Board, as part of Regulation Y, included institutions that were not banks within the Board's regulatory ambit. The Court concluded that the Board had exceeded its authority in attempting to regulate the "nonbank banks."
 
 
 64
 The Court found that the BHCA "vests broad regulatory authority in the Board over bank holding companies 'to restrain the undue concentration of commercial banking resources and to prevent possible abuses related to the control of commercial credit.' " Id. at 365, 106 S.Ct. at 684, quoting S.Rep. No. 91-1084 (1970), U.S.Code Cong. & Admin.News 1970, p. 5541. The Board's new definitions did not fall within the plain purposes of the BHCA, the Court concluded. The Court added that "Sec. 5 only permits the Board to police within the boundaries of the Act...." Id. at 373 n. 6, 106 S.Ct. at 688 n. 6.
 
 
 65
 First Lincolnwood and Dimension Financial together teach that the primary purposes of the BHCA are to prevent the concentration of control of banking resources, and to separate banking from nonbanking enterprises. First Lincolnwood is narrowly written and expressly limits the Board's authority to consider financial and managerial soundness of subsidiary banks to the Board's decision to grant or deny a holding company's application. Section 3(c) of the BHCA specifically grants this authority to the Board. The BHCA does not grant the Board authority to consider the financial and managerial soundness of the subsidiary banks after it approves the application, and First Lincolnwood finds this regulatory authority lacking in the day-today operations of a subsidiary bank. For these reasons, we conclude that the Board is without authority under the BHCA to require MBank to transfer its funds to its troubled subsidiary bank.[5]
 
 
 66
 The Board asserts as an independent basis for its source of strength regulation, policy statement and enforcement proceedings its broad authority under Sec. 1818(b)(1) and (3) of FISA to order a holding company to cease and desist from any activity that, in the Board's judgment, constitutes an unsafe or unsound practice. The Board argues that MCorp's failure to provide capital to its subsidiary banks is an unsafe or unsound practice which the Board may act to restrain under Sec. 1818.
 
 
 67
 In determining whether we should accept the Board's interpretation of a statute the Board is charged with enforcing, we look to the test established by the Supreme Court in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 68
 If Congress has spoken clearly to the issue presented in a case, that intent controls. 467 U.S. at 844 [104 S.Ct. at 2782]. If the agency's interpretation is contrary to the clear intent of Congress, the agency's interpretation is invalid. If, on the other hand, Congress had no clear intent as to the particular question at issue, the courts may invalidate the agency's interpretation only if it is "unreasonable" or "impermissible." Id.
 
 
 69
 Investment Co. Institute v. Federal Deposit Ins. Corp., 815 F.2d 1540, 1546 (D.C.Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). See also American Insurance Assoc. v. Clarke, 865 F.2d 278, 280-81 (D.C.Cir.1988).
 
 
 70
 The Congress has not spoken clearly to what constitutes an unsafe or unsound practice, leaving the development of the phrase to the regulatory agencies. As we stated in Groos Nat'l Bank v. Comptroller of Currency, 573 F.2d 889, 897 (5th Cir.1978), "[t]he phrase 'unsafe or unsound banking practice' is widely used in the regulatory statutes and in case law, and one of the purposes of the banking acts is clearly to commit the progressive definition and eradication of such practices to the expertise of the appropriate regulatory agencies." Thus, under the Chevron analysis, in the absence of clear congressional intent on the meaning of this language, we must examine the "reasonableness" and "permissibility" of the Board's interpretation that the failure of the holding company to inject capital into subsidiary banks is an "unsafe or unsound" practice.
 
 
 71
 In Gulf Federal Sav. & Loan Ass'n v. Federal Home Loan Bank Bd., 651 F.2d 259 (5th Cir.1981), cert. denied, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982), the Federal Home Loan Bank Board found that Gulf Federal's contracting practice was an "unsafe or unsound" practice within the meaning of Sec. 1818. We disagreed and concluded that the FHLBB's finding that Gulf Federal's use of inconsistent contract terms was an unsafe or unsound practice was not a reasonable interpretation of the "unsafe or unsound practice" provision.
 
 
 72
 We also noted in Gulf Federal that the "unsafe or unsound practice" provision was the subject of lively congressional debate at the time the statute was enacted. We observed that the authoritative definition of an unsafe or unsound practice, adopted in both Houses, was that:
 
 
 73
 Generally speaking, an "unsafe or unsound practice" embraces any action, or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds.
 
 
 74
 Id. at 264, quoting 112 Cong.Rec. 26474 (1966). See 112 Cong.Rec. 24984, 26474 (1966).
 
 
 75
 Enforcement of the Board's source of strength regulation requiring MCorp to transfer MCorp's funds to the troubled subsidiary banks can hardly be considered a "generally accepted standard[ ] of prudent operation." Such a transfer of funds would require MCorp to disregard its own corporation's separate status; it would amount to a wasting of the holding company's assets in violation of its duty to its shareholders. Also, one of the fundamental purposes of the BHCA is to separate banking from commercial enterprises. That purpose is obviously not served if the Board is permitted to treat a holding company as merely an extension of its subsidiary bank.
 
 
 76
 Congress first under the BHCA in 1956 and later in amendments to the Federal Reserve Act in 1966 has generally defined with specificity the dealings between subsidiary banks and nonbank affiliates, including holding companies, it considered unsafe and unsound. See Bank Holding Company Act of 1956, c. 240, Sec. 6, 70 Stat. 137, repealed by Pub.L. No. 89-485, Sec. 9, 80 Stat. 240 (1966); Pub.L. No. 89-485, Sec. 12(a) (amending 12 U.S.C. Sec. 371c). See also S.Rep. No. 1179, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Admin.News 2394-96. Congress made no effort in any of this legislation to require holding companies to make capital injections into subsidiary banks as part of these safeguards. Congress noted only that the provision enacted as part of the BHCA "does not prohibit the borrowing of funds by any subsidiary in the system from the parent bank holding company." S.Rep. No. 1095, 84th Cong., 1st Sess., reprinted in 1956 U.S.Code Cong. & Admin.News 2482, 2496. In sum, Congress set forth detailed limits on transactions considered unsound between subsidiary banks and holding companies, without mentioning the infusion of capital by holding companies into subsidiaries. This strongly supports MCorp's argument that Congress never intended to grant authority to the Board to require a holding company to inject capital into subsidiary banks as a safeguard against "unsafe or unsound" practices.
 
 
 77
 This is consistent with the conclusion reached by the Shadow Financial Regulatory Committee,[6] responding to the Board's source of strength policy. The Committee stated that, "while Congress has empowered regulators of banks to issue capital directives to institutions in their charge, it has not authorized the Fed to issue capital directives to bank holding companies." 48 Banking Rep. (BNA) No. 21, at 923 (May 25, 1987).
 
 
 78
 Thus, we conclude that the Board's determination that the holding company's failure to transfer its assets to a troubled subsidiary was an "unsafe or unsound practice" under Secs. 1818(b)(1) and (3) is an unreasonable and impermissible interpretation of that term.
 
 
 79
 It is not our role to pass judgment on the wisdom of the scheme Congress put in place to regulate bank holding companies. Similarly, the Board cannot exceed the authority Congress granted to it to correct perceived flaws in the congressional scheme. As the Supreme Court stated in Dimension Financial:
 
 
 80
 The statute may be imperfect, but the Board has no power to correct flaws that it perceives in the statute it is empowered to administer. Its rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute.
 
 
 81
 If the Bank Holding Company Act falls short of providing safeguards desirable or necessary to protect the public interest, that is a problem for Congress, and not the Board or the Courts, to address.
 
 
 82
 474 U.S. at 374, 106 S.Ct. at 688-689 (footnote omitted).[7]
 
 III.
 
 83
 Because we find that the Board's source of strength proceedings exceed its statutory authority, we remand this case to the district court with instructions to enjoin the Board from further prosecution of this charge. The remaining preliminary injunction entered by the district court is vacated because it lacked subject matter jurisdiction to interfere with the Board's Sec. 23A proceedings.
 
 
 84
 REVERSED, VACATED and REMANDED.
 
 
 
 [1]
 Section 23A of the Federal Reserve Act, 12 U.S.C. Sec. 371c, prohibits a bank from extending credit to a nonbank affiliate unless the extension of credit is secured by collateral having a market value of at least 100 percent of the loan. The Board has charged that MCorp violated this requirement by causing two of its former subsidiary banks to extend $63.7 million of unsecured credit to an affiliated subsidiary of MCorp, and failing to make timely repayments to the subsidiary banks that extended the credit
 
 
 [2]
 Termination of status as insured depository institution, section 1818 which is captioned in Sec. (b)(1) and (3):
 (b) Cease-and-desist proceedings
 (1) If, in the opinion of the appropriate Federal banking agency, any insured depository institution ... is engaged or has engaged, or the agency has reasonable cause to believe that the depository institution ... is about to engage, in an unsafe or unsound practice in conducting the business of such depository institution, or is violating or has violated, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to violate, a law, rule, or regulation ... the agency may issue and serve upon the depository institution or such party a notice of charges in respect thereof ...
 (3) This subsection ... shall apply to any bank holding company, and to any subsidiary (other than a bank) of a bank holding company, as those terms are defined in the Bank Holding Company Act of 1956.... Nothing in this subsection or in subsection (c) of this section shall authorize any Federal banking agency, other than the Board of Governors of the Federal Reserve System, to issue a notice of charges or cease-and-desist order against a bank holding company or any subsidiary thereof (other than a bank or subsidiary of that bank).
 12 U.S.C. Secs. 1818(b)(1) and (3), amended by FIRREA, Pub.L. No. 101-73, Secs. 901(d), 902(a)(1)(A).
 
 
 [3]
 Because we conclude that the source of strength proceedings exceed the Board's statutory authority, we need not resolve whether the source of strength charges relating to MCorp's former subsidiary banks are beyond the Board's authority
 
 
 [4]
 Section 1842 states in relevant part:
 Acquisition of bank shares or assets
 (c) Factors governing determination of application for approval ...
 In every case, the Board shall take into consideration the financial and managerial resources and future prospects of the company or companies and the banks concerned, and the convenience and needs of the community to be served.
 
 
 [5]
 As a condition to approving an application, the Board could possibly require the holding company to agree to maintain the subsidiary banks to some degree of financial soundness. The Federal Home Loan Bank Board (FHLBB) has long followed this practice in approving savings and loan holding company applications; in 1981, we approved the practice in Kaneb Services, Inc. v. Federal Sav. & Loan Ins. Corp., 650 F.2d 78 (5th Cir.1981). The statutory authority of the FHLBB to regulate savings and loan holding companies is practically identical to the authority granted the Board to regulate bank holding companies. See 12 U.S.C. Secs. 1730(e)(1) and (3), 1730a(e)(2); Regulatory Capital Maintenance Obligations of Acquirers of Insured Institutions, 53 Fed.Reg. 31761 (1988); Acquisition of Control of Insured Institutions, 54 Fed.Reg. 32959 (1989) (to be codified at 12 C.F.R. Sec. 574.7(a)(2) and (3)). The Office of Thrift Supervision, the successor to the FHLBB as primary regulator of savings and loan holding companies after FIRREA, continues this practice in its current regulations. See Transfer and Recodification of Regulations Pursuant to Financial Institutions Reform, Recovery and Enforcement Act, 54 Fed.Reg. 49411 (1989)
 
 
 [6]
 Formed in February 1986, the Shadow Financial Regulatory Committee (SFRC) meets periodically to monitor regulations of the financial services industry. The SFRC is composed of economists, academics and former financial regulators
 
 
 [7]
 The Board also asserts on appeal that its administrative proceedings are exempt from both the Bankruptcy Code's automatic stay provision, 11 U.S.C. Sec. 362(b), and the general equitable power of the bankruptcy court under Sec. 105 of the Code. Because we find that the district court, sitting in bankruptcy, lacks jurisdiction over the Board's ongoing enforcement actions, we need not address MCorp's argument that the Bankruptcy Code's stay provisions prevent the Board from proceeding