**SYNOVUS FINANCIAL CORPORATION,**
Petitioner,

v.

**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,**
Respondent,

SouthTrust Corporation, Intervenor.

No. 89–1394.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 11, 1990.

Decided Dec. 20, 1991.

As Amended Dec. 20, 1991.

Rehearing Denied March 27, 1992.

Suggestion for Rehearing En Banc Denied March 27, 1992.

Griffin B. Bell and James D. Miller, with whom Deborah J. Andrews and Marcus B. Calhoun, Jr., were on the brief, for petitioner.

Richard M. Ashton, Associate Gen. Counsel, Federal Reserve System, with whom Stuart M. Gerson, Asst. Atty. Gen., U.S. Dept. of Justice, James V. Mattingly, Jr., Gen. Counsel, and Katherine H. Wheatley, Senior Atty., Federal Reserve System, were on the brief, for respondent.

Hobart A. McWhorter, Jr., with whom J. David Dresher, Robert C. Eager, Paul Blankenstein, and Patricia T. Mandt, and Theodore J. Boutrous, Jr., were on the brief, for intervenor.

Amelia Waller Baker, Staff Atty., was on the brief for amicus curiae, State of Ga., urging reversal.

Before: SILBERMAN, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

Dissenting opinion filed by Circuit Judge SILBERMAN.

KAREN LeCRAFT HENDERSON, Circuit Judge:

SouthTrust Corporation (SouthTrust), a multi-state bank holding company based in Alabama, relocated the main office of a subsidiary bank from Alabama to Georgia. Before doing so, SouthTrust obtained approval from both the Office of the Comptroller of the Currency (OCC) and the Federal Reserve Board (Board). Synovus Financial Corporation (Synovus), a Georgia bank holding company, appeals the Board's approval and claims that the Board misinterpreted Georgia's banking laws. SouthTrust has intervened, nominally in support of the Board, to challenge the Board's authority over interstate relocations. We agree with SouthTrust that the Board is without such authority; therefore, we vacate its decision without reaching the issues Synovus raises.

## I.

This case began when SouthTrust attempted to move the main office of one of its subsidiary banks across a river, to a location less than ten miles away. That bank, SouthTrust National Bank (STNB), was located in Phenix City, Alabama, and sought to move to Columbus, Georgia. The two cities, separated only by the Chattahoochee River, form a single metropolitan area as well as a single banking community. *See* Federal Reserve Board Order Approving Acquisition of a Bank and Establishment of a De Novo Bank (May 22, 1989), Joint Appendix (JA) 1, 3 n. 13; Decision of the Comptroller of the Currency on the Application of SouthTrust National Bank, Phenix City, Alabama, to Relocate its Main Office to Columbus, Georgia (Feb. 21, 1989), JA 125. In conjunction with the relocation, STNB planned to retain its Alabama branch offices and to establish a new branch office in Phenix City, whence its main office was moving.

SouthTrust's first step was to file an application with the OCC. JA 6. The application initially met with protest from the Department of Banking and Finance of the State of Georgia (Georgia), which maintained that the relocation contravened Georgia law. In response to this protest, SouthTrust withdrew its proposals to retain STNB's Alabama branches as STNB branches and to establish a new branch in Phenix City. In turn, Georgia withdrew its protest. *See* OCC Decision, JA 125. The OCC then granted SouthTrust's application to relocate STNB in Georgia as a separate bank while SouthTrust continued to operate STNB's former Alabama branches. In reaching its decision, the OCC explained that section 30(b) of the McFadden Act, 12 U.S.C. § 30(b), expressly governs main office relocations and that, by amendment, section 30 allows relocations within a thirty-mile radius whether or not the relocation crosses state lines.[1] JA 127–30.

At the same time SouthTrust sought the OCC's approval, the Board demanded that SouthTrust seek its approval as well. The Board asserted that the Douglas Amendment to section 3 of the Bank Holding Company Act (BHC Act), 12 U.S.C. § 1842(d)—which requires the Board to dis-

---

1. Section 30(b) provides in relevant part:

   Any national banking association ... may change the location of its main office to any authorized branch location within the limits of the city, town, or village in which it is situated, or, with a vote of shareholders owning two-thirds of the stock of such association for a relocation outside such limits and upon receipt of a certificate of approval from the Comptroller of the Currency, to any other location within or outside the limits of the city, town or village in which it is located, but not more than thirty miles beyond such limits. 12 U.S.C. § 30(b). Before 1959, section

   30 authorized national banks to relocate "to any other place *within the same state* not more than 30 miles distant." Act of May 1, 1886, Ch. 73, § 2, 24 Stat. 18 (emphasis added). The OCC has consistently interpreted Congress's deletion of the words "within the same state" to manifest its authorization of interstate relocations. *See, e.g., Decision of the Comptroller of the Currency on the Application of Mark Twain Bank* (Feb. 21, 1985), *reprinted in* Fed.Banking L.Rep. [CCH] ¶ 86,-180; *Decision of the Comptroller of the Currency on the Application of The Bank of New Jersey* (May 13, 1986).

approve the "acquisition" by a bank holding company or its subsidiary of an out-of-state bank when state law does not allow it—also requires, by implication, the Board to prohibit the "relocation" of a bank across state lines if state law does not allow it.[2] *See* 12 C.F.R. § 223.144. SouthTrust initially resisted the Board, claiming that the Douglas Amendment does not apply to relocations. JA 42 (letter dated Aug. 18, 1987). But when the Board informed SouthTrust that it considered SouthTrust's failure to file an application a violation of the Bank Holding Company Act, JA 45 (letter dated Sept. 20, 1988), SouthTrust filed an application under protest, JA 46 (protest letter and application, dated Nov. 3 and 4, 1988, respectively). Several months later, SouthTrust submitted a second application to the Board, this time requesting permission to acquire the SouthTrust Bank of Russell County, a *de novo* bank located in Phenix City. JA 153 (application dated Mar. 3, 1989). This national bank was intended to replace STNB in Phenix City and was to be kept entirely separate from STNB in Georgia. *See* Board Order, JA 3 n. 11.

After the Board asserted that STNB's "relocation" was an "acquisition" within the meaning of the Douglas Amendment, Georgia followed suit and requested South-Trust to file an application with Georgia under its banking law regulating "acquisitions." JA 44 (letter dated Aug. 26, 1987); Addendum D to SouthTrust Brief, A–26 (letter dated Sept. 20, 1988). When the Board formally requested Georgia to explain the meaning of section 7–1–621(d)(2) of the Georgia Code which controls the "acquisition" of a Georgia bank by an out-of-state bank holding company, JA 58 (letter dated Nov. 16, 1988), however, Georgia conceded that "Georgia law is silent on the issue of the interstate relocation of a banking subsidiary of a bank holding company," JA 70 (letter dated Dec. 6, 1988). Further, Georgia explained that section 7–1–621(d)(2) permits an out-of-state bank to "acquire" a Georgia bank only if (i) "the out-of-state bank holding company is located in another state within the 'Southern Region'"; (ii) the out-of-state bank's home state "provides reciprocal privileges to bank holding companies located in Georgia"; and (iii) "the Georgia bank has been in existence and continuously operated as a bank for a period of five (5) years or more." JA 70 (citing Ga.Code Ann. § 7–1–621).[3] Georgia then concluded: "[T]he fact

---

2. The Douglas Amendment to section 3 of the BHC provides:

> [N]o application ... shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside of the State in which the operations of such bank holding company's banking subsidiaries were principally conducted ... *unless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication.*

12 U.S.C. § 1842(d) (emphasis added). Section 3 of the BHC Act also provides:

> It shall be unlawful, except with the prior approval of the Board, (1) for any action to be taken that causes a company to become a bank holding company; (2) for any action to be taken that causes a bank to become a subsidiary of a bank holding company; (3) for any bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank if, after such acqui-

sition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank; (4) for any bank holding company of subsidiary thereof, other than a bank, to acquire all or substantially all of the assets of a bank....

12 U.S.C. § 1842(a).

3. Georgia law defines an "acquisition" as:

> (A) The merger or consolidation with another bank holding company;
>
> (B) The acquisition of the direct or indirect ownership or control of voting shares of another bank holding company or bank if, after such acquisition, such bank holding company will directly or indirectly own or control more than 5 percent of the class of voting shares of such bank holding company or bank;
>
> (C) The direct or indirect acquisition of all or substantially all of the assets of another bank holding company or bank; or
>
> (D) The taking of any other action that would result in the direct or indirect control of another bank holding company or bank.

Ga.Code Ann. § 7–1–620(1) (1988).

that Georgia law does not expressly authorize the proposed interstate relocation raises serious questions about whether the transaction violates Georgia policy and federal law." JA 71.

Contrary to Georgia's position, the Board, in its final order, concluded that "the Georgia statute permitting regional bank holding companies to 'acquire ... a Georgia bank' would encompass the relocation of [STNB], as proposed here." JA 2. The Board then determined that the "acquisition" complied with Georgia law which in relevant part provides:

> (d) ... no Georgia bank holding company or Southern Region bank holding company may:
>
> \* \* \* \* \* \*
>
> (2) Directly or indirectly acquire a Georgia bank unless such bank has been in existence for five years or more prior to the date of application to the commissioner for approval of such acquisition.

Ga.Code Ann. § 7–1–621. According to the Board:

> [STNB] does not currently qualify as "a Georgia bank" under Georgia law because [STNB] operates in Alabama. Under Georgia law, a Georgia bank is defined as a bank having offices only in Georgia. The proposed relocation, however, is an action that would cause [STNB] to maintain offices only in Georgia. As a result of that action, SouthTrust would acquire a Georgia bank within the meaning of the Georgia regional banking statute. Accordingly, the Board believes that Georgia law specifically authorizes this method of acquiring a Georgia bank for purposes of the Douglas Amendment.

JA 2 (footnotes omitted). Thus, in sum, the Board concluded that Georgia law expressly authorizes relocations to Georgia and that Georgia law would permit the relocation in this case. The Board also summarily rejected SouthTrust's contention that the Douglas Amendment does not grant the Board authority over relocations. JA 1–2.

In concluding that Georgia law permits STNB's relocation, the Board specifically conditioned its approval on STNB's receipt of "any necessary approvals from the Georgia Commissioner of Banking and Finance under the Georgia interstate banking statute." JA 3. Georgia then alerted SouthTrust to the conditional nature of the Board's order and informed it that Georgia had not yet issued any approval. JA 212 (letter dated Jun. 2, 1989). Georgia further advised that "[s]uch action would now appear necessary ... in light of the [Board's] characterization of the proposal as an 'acquisition.'" *Id.* SouthTrust, however, failed to submit an application to Georgia and began preparations for the relocation of STNB to Georgia.

Georgia continued to insist that the Board's decision was erroneous. In August 1989, Georgia informed SouthTrust:

> We continue to believe that the silence of Georgia law on the matter of interstate relocations effectively prohibits such relocations by a bank holding company subsidiary as a matter of federal law.

Exhibit A to Synovus Brief at 2a (letter dated Aug. 3, 1989). Georgia concluded that the Board, in determining whether the requirements of the Douglas Amendment had been satisfied, wrongly interpreted Georgia law. *Id.* Georgia then addressed a letter to the Board, reaffirming this view. Exhibit B to Synovus Brief (letter dated Sept. 21, 1989). In particular, Georgia emphasized that SouthTrust did not "acquire" a Georgia bank as allowed by Georgia banking laws but instead effectively created a new bank in Georgia. *Id.* at 7a–8a. Again Georgia concluded:

> It is the position of the Department, therefore, that the method by which SouthTrust Corporation, an Alabama bank holding company, proposes to enter Georgia—by the relocation of SouthTrust to Georgia—is not permitted by the Georgia Act. Accordingly, the proposed transaction not only violates Georgia law, but also violates the Douglas Amendment.

*Id.* at 9a.

In October 1989, when SouthTrust was finalizing its move into Georgia and after the instant petition had been filed, Georgia

notified the Board that SouthTrust had not satisfied the condition set forth in the Board's order and asked the Board to suspend SouthTrust's authority to relocate. Exhibit A to Federal Reserve Board Brief (letter dated Oct. 25, 1989). The Board rejected Georgia's request, reasoning:

> The Board's order was conditioned on SouthTrust obtaining "any necessary approvals" from the Department. The Board took no position on whether or not any approvals were required under State law. To the Board's knowledge, your office has not to date advised SouthTrust that approval by the Department is required by Georgia law for this transaction. Accordingly, at this time there is no basis to conclude that the condition precedent in the Board's approval has not been met.

Exhibit B to Federal Reserve Board Brief (letter dated November 6, 1989). Georgia responded to the Board's denial by letter dated November 13, 1989. *See* Exhibit A to Synovus Reply Brief. In that letter, Georgia fully exposed the dilemma caused by the Board's interpretation of Georgia law:

> If the interpretation used by [Georgia] is correct, then there would be no basis for an application to the Georgia Department of Banking and Finance and the transaction would have been denied by the [Board]. If on the other hand, the Board's interpretation of Georgia law is found to be correct, then an application to the Georgia Department of Banking and Finance would in fact be required.
>
> \*   \*   \*   \*   \*   \*
>
> Neither the Board nor the Department can respond to the question of whether or not the Department of Banking and Finance's approval is required until the appellate court completes its review and selects the proper interpretive analysis.

*Id.* at 3a–4a. In short, Georgia recognized that it could not interpret Georgia law in a manner inconsistent with the Board's interpretation: if it did so, it would be unable to stop the relocation it deemed to be unlaw-

ful. As Georgia reasoned, a unified view of Georgia law was necessary: either the Board was correct, that is, Georgia law covered the transaction and Georgia's approval was necessary; or Georgia law did not allow the relocation and no basis for approval existed. *Id.* Nonetheless, despite Georgia's protest, the Board did not suspend its approval and STNB relocated to Columbus, Georgia, where it has been operating ever since.

Synovus, the Georgia bank holding company, appealed the Board's order to this court pursuant to 12 U.S.C. § 1848. Synovus argues that the Board misinterpreted Georgia law and that the Douglas Amendment requires the Board to reject STNB's relocation. SouthTrust, on the other hand, appears in this appeal as an intervenor—nominally in support of the Board—and reasserts its claim that the Board is without authority over STNB's relocation. Both the Board and Synovus challenge SouthTrust's ability, as an intervenor, to raise a separate issue. Following oral argument, we requested the parties and the OCC to submit supplemental briefs on the issue pressed by SouthTrust. Neither the Board nor the OCC responded to our order but instead the Attorney General submitted a brief on behalf of the "United States," taking the position that the Board is without authority over relocations. While the Board has filed no post-argument brief separate from that of the Attorney General, it has at the same time taken no action—either in these proceedings or administratively—to reverse its stance.[4]

## II.

■ In the typical civil appeal, the prevailing party may support the judgment by any argument raised below even though the lower court rejected it and based its decision on another ground. *United States v. American Ry. Express Co.,* 265 U.S. 425, 435–36, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924); *see Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 38–39, 109 S.Ct. 2782, 2788, 106 L.Ed.2d 26 (1989); *Morley*

---

**4.** The Board's pre-argument reply brief expressly argues its authority over relocations. Its

opening brief primarily addresses the meaning of Georgia law.

*Constr. Co. v. Maryland Casualty Co.,* 300 U.S. 185, 191, 57 S.Ct. 325, 328, 81 L.Ed. 593 (1937). Having all the issues considered in one appeal promotes judicial efficiency and avoids the spectacle of parties bouncing back and forth between the courts of appeals and district courts in a one-issue-per-appeal system of appellate review. SouthTrust, as the prevailing party before the Board, is in a position comparable to a party who, having won in the district court, is now seeking to defend the result below on a ground raised but decided against it. The distinction is that, unlike a party in a district court action, SouthTrust did not automatically become an appellate party upon Synovus's filing in the court of appeals. *See Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.,* 379 U.S. 411, 430–31, 85 S.Ct. 551, 563, 13 L.Ed.2d 386 (1965) (Douglas, J., dissenting). Rather, SouthTrust either had to intervene or had to petition for review as an aggrieved party in order to continue its participation, despite the fact that SouthTrust is in the center of the controversy. At that time, SouthTrust simply had no interest in filing a petition because it won below.

Thus, the question is whether SouthTrust's appearance before this court as an intervenor rather than a party prevents it from defending its position on the same grounds it raised before the Federal Reserve Board. It would be strange if there were some jurisdictional bar preventing SouthTrust from doing so and we perceive none.

First, we disagree with the Board's contention that SouthTrust lacks standing merely because the decision below was in its favor. It now appears that SouthTrust's victory before the Board was illusory. The Board's final order was expressly conditioned on SouthTrust obtaining "necessary approvals from the Georgia Commissioner of Banking and Finance under the Georgia interstate banking statute regarding [STNB]." JA 3; *see also* Exhibit A to Federal Reserve Board Brief (Georgia informs Board of SouthTrust's non-compliance with condition placed in Board order); Exhibit B to Federal Reserve Board Brief

(Board acknowledges that approval was conditional). Since the filing of the petition for review, Georgia has informed South-Trust that, if this court upholds the Board's decision, Georgia will require an application from SouthTrust. Exhibit A to Reply Brief for Synovus (letter dated November 13, 1989). Georgia has also made it clear that the application will be denied. *See, e.g.,* Exhibit A to Synovus Brief (letter from Georgia to SouthTrust dated August 3, 1989) 2a ("We continue to believe that the silence of Georgia law on the matter of interstate relocations effectively prohibits such relocations"); Exhibit B to Synovus Brief (Letter from Georgia to Board dated September 21, 1989) 9a ("It is the position of the Department, therefore, that the method by which SouthTrust Corporation ... proposes to enter Georgia ... is not permitted by the Georgia Act"); Exhibit A to Synovus's Reply Brief (letter from Georgia to Board dated November 13, 1989) ("Irrespective of the outcome of appellate review, the transaction should not go forward at this time because, in the event of one outcome, Department approval must be sought and, in the event of the alternative outcome, the transaction would likely be denied."). Given the likelihood that Georgia will exercise the veto power it holds under the Board's order and withhold approval of the relocation, we conclude that SouthTrust is "aggrieved" so as to have standing to seek review under 12 U.S.C. § 1848.

Second, 12 U.S.C. § 1848, which confers jurisdiction on this court, does not, by its terms, limit us to considering only the issues raised by the petitioner and the respondent. Petitions under section 1848, filed by "[a]ny party aggrieved by an order of the Board," vest this court with "jurisdiction to affirm, set aside, or modify the order of the Board." Our jurisdiction, in other words, is over the Board's order, much the same as our jurisdiction in a typical civil appeal is over the *judgment* or *decree* of the district court. 28 U.S.C. § 1291; *Ex parte Tiffany,* 252 U.S. 32, 36, 40 S.Ct. 239, 240, 64 L.Ed. 443 (1920).

On what grounds we decide "to affirm, set aside, or modify" a Board order over which we have jurisdiction is a different matter. *Cf. Fusari v. Steinberg*, 419 U.S. 379, 387–88 n. 13, 95 S.Ct. 533, 539 n. 13, 42 L.Ed.2d 521 (1975). The general rule is that we will consider only issues raised by the petitioner and the respondent—here Synovus and the Board—and that intervenors must restrict their arguments to those issues, although our local rule encourages intervenors to present arguments "not made" by the party they are supporting. D.C.Cir.R. 11(e)(2). But there is nothing in our local rule or in Rule 15(d) of the Federal Rules of Appellate Procedure (intervention) that forbids an intervenor from raising, or a reviewing court from considering, an issue not mentioned by the petitioner or respondent but fully litigated in the agency proceedings and potentially determinative of the outcome of judicial review. Rule 15(d) simply requires the intervenor to file a motion setting forth its interest and the grounds on which intervention is sought, requirements SouthTrust fulfilled in this case.

In addition to the absence of anything in the relevant statutory provisions or the Federal Rules of Appellate Procedure that would compel us to turn SouthTrust away, there is nothing in the general principles of administrative law that prevents our hearing SouthTrust's claim about the Board's lack of authority to issue the order under review. SouthTrust is not an intermeddler. It fully participated in the proceedings before the Board and it raised the issue it now seeks to bring before us. *Cf.* 28 U.S.C. § 2348; *Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 156 (D.C.Cir.1985). While courts must not decide issues left open by the agency, *see, e.g., FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 647, 92 S.Ct. 1827, 1841, 32 L.Ed.2d 369 (1972), or sustain an order based upon reasoning the agency declined to adopt, *see SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we do neither here. Instead we overturn a specific ruling made by the Board, that it has authority over SouthTrust's relocation, and vacate its final order.

Moreover, permitting SouthTrust to raise the authority issue makes eminent sense and is consistent with this court's traditionally flexible approach toward appellate procedure. *See Spann v. Colonial Village, Inc.*, 899 F.2d 24, 32–33 (D.C.Cir.1990) (finding "the requisite exceptional circumstances" to justify permitting cross-appeal despite party's failure to file such); *California Pub. Broadcasting Forum v. FCC*, 752 F.2d 670, 683 n. 10 (D.C.Cir.1985) (rejecting seventh circuit view that intervenor may not oppose agency in any respect and observing that "[t]his circuit has not required such procedural niceties and has allowed intervention where an appeal was also possible"); *New South Media Corp. v. FCC*, 644 F.2d 37 (D.C.Cir.1981) (per curiam) (permitting party seeking modification or reversal of agency decision to participate in appeal as intervenor, rather than requiring that party to file its own appeal). To do otherwise would lead to absurd results. SouthTrust prevailed before the Board and therefore had no particular incentive to file a petition for review. Synovus did not file its petition for review until the eleventh hour.[5] If we categorically refuse to consider any issues other than those raised in the petition for review, SouthTrust and similarly situated parties would be forced to file "protective" petitions for review, a practice that unnecessarily would exalt form over substance. All that would do is clutter our docket, increase the time and expense of litigation and perhaps breathe life into a dispute that otherwise might have come to rest.

The parties have briefed the authority issue fully. If we were to agree that the Board's view of Georgia law was wrong, we would needlessly prolong this extended controversy by sending the case back to the Board only to have it return to us on SouthTrust's petition after the Board exercised its disputed authority to block the

---

**5.** The Board issued its final order on May 21, 1989. Synovus did not file its petition until June 21, 1989, the last day on which a timely petition could be filed. *See* 12 U.S.C. § 1848 (requiring that petition be filed "within thirty days after the entry of the Board's order").

relocation. This would make no sense for the same reasons it would make no sense in a case on appeal from a district court.

■ Our statement in *Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776 (D.C.Cir.1990), does not preclude us from deciding the question SouthTrust presents. *Illinois Bell* establishes the general rule that "[a]n intervening party may join issue only on a matter that has been brought before the court by another party," 911 F.2d at 786, but this is a prudential restraint rather than a jurisdictional bar. Like other such doctrines—exhaustion of administrative remedies, for instance—the statement in *Illinois Bell* should not be applied categorically. *Cf. Natural Resources Defense Council, Inc. v. EPA*, 824 F.2d 1146 (D.C.Cir.1987) (*en banc*). Furthermore, *Illinois Bell* is readily—and materially—distinguishable from the situation here. Unlike SouthTrust, the intervenor in *Illinois Bell* was the losing party in the administrative proceeding. It therefore had every incentive to petition for review of the administrative decision and its failure to do so was without excuse. Perhaps more importantly, the intervenor's challenge in *Illinois Bell* had absolutely no substantive connection with the issues raised by the petition for review. 911 F.2d at 786. In contrast, the issue SouthTrust raises is "an essential" predicate to the question whether the Board properly interpreted Georgia law. *Cf. Vance v. Terrazas*, 444 U.S. 252, 258–59 n. 5, 100 S.Ct. 540, 544 n. 5, 62 L.Ed.2d 461 (1980). Synovus's challenge to the Board's order presupposes that the Board had authority to interpret Georgia law in the first place.

For all of the preceding reasons, we find it proper under the circumstances to address and decide the authority issue raised by intervenor SouthTrust.

### III.

To determine whether the Board has authority over interstate relocations, "we begin, of course, with the language of the statute." *Board of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d

691 (1986). "If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Id.* (quoting *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)).

The Board contends that its authority to approve or disapprove STNB's relocation emanates from the Douglas Amendment, 12 U.S.C. § 1842(d). As we have noted, the Douglas Amendment provides that a bank holding company cannot "acquire" an out-of-state bank "unless the acquisition ... is specifically authorized by the statute laws of the State in which such bank is located." 12 U.S.C. § 1842(d). Section 3 of the BHC Act enumerates the transactions that constitute an "acquisition" for the purpose of the Douglas Amendment: (i) "any action ... that causes a bank to become a subsidiary of a bank holding company"; (ii) "for any bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank"; or (iii) "for any bank holding company of subsidiary thereof, other than a bank, to acquire all or substantially all of the assets of a bank." 12 U.S.C. § 1842(a). Each of the transactions described in section 3 involves a bank holding company obtaining *control* over a subsidiary bank. Nothing in the statute, however, indicates that an "acquisition" as used in the Douglas Amendment includes the "relocation" of a subsidiary bank. Because the language used by Congress is free from ambiguity, we must interpret the statute according to its plain language and conclude that the Douglas Amendment does not grant the Board authority over relocations. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781.

■ In contrast to the language of section 3 of the BHC Act, the McFadden Act expressly grants the OCC authority over the "relocation" of bank headquarters. 12 U.S.C. § 30(b), *supra* note 1. Given the

use of the word "relocation" in section 30(b) and the use of the word "acquisition" in the Douglas Amendment, we are hesitant to interpret acquisition to mean relocation. Additionally, that Congress expressly delegated authority to the OCC over relocations strongly suggests that the Board, having not received any express authorization, lacks the concurrent jurisdiction it purports to assert.[6] The Board's expansive interpretation of the Douglas Amendment—that it authorizes the Board to review relocations for compliance with state banking laws—directly contradicts section 30 of the McFadden Act. Section 30 explicitly places authority over relocations with the OCC and has been generally construed to preempt state banking laws. *See Ramapo Bank v. Camp*, 425 F.2d 333 (3d Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 57, 27 L.Ed.2d 58 (1970); *Traverse City State Bank v. Empire Nat'l Bank*, 228 F.Supp. 984 (W.D.Mich.1964); *cf. North Dakota v. Merchants Nat'l Bank & Trust Co., Fargo, N.D.*, 634 F.2d 368 (8th Cir.1980) (§ 30 provision that OCC approve bank name changes preempts state law); *Marion Nat'l Bank of Marion v. Van Buren Bank*, 418 F.2d 121, 123 (7th Cir.1969) ("Relocation of a national bank is permitted in certain circumstances, and with the approval of the comptroller, by 12 U.S.C. § 30. The propriety of the move is not made to depend on state law."). The Board's construction of the Douglas Amendment, however, allows the Board to override the OCC's decisions and to resurrect state law.

Acknowledging the absence of an express grant of authority, the Board makes two arguments to support its position. First, the Board claims that every approval of an interstate acquisition is subject to the implied condition that the acquired bank remain located in the same state:

> [A] bank holding company's authority to control a bank, which derives from the

Board's approval under the BHC Act for the acquisition of the bank, must necessarily be limited by, and cannot be broader than, the Board's authority to grant approval for the acquisition in the first place. In other words, a bank holding company's authority to continue to control a bank acquired pursuant to the terms of the BHC Act is subject to the limitation of the BHC Act that the bank remain located in the state specified in its application to the Board to acquire the bank.

12 C.F.R. § 225.144(c). Second, the Board reasons that its authority over interstate relocations is "necessary in order to give effect to the Congressional intent underlying the Douglas Amendment to maintain state control over the acquisition of banks within their borders." 12 C.F.R. § 225.-144(e). Otherwise, the Board contends, the purpose of the Douglas Amendment could be thwarted if a bank holding company were authorized to acquire a bank in one state and then allowed to move the bank to another state where the company would not have been able to acquire it in the first place. According to the Board:

> The Douglas Amendment was adopted to prevent the creation or expansion of interstate banking networks through acquisition by a bank holding company of control of a bank located outside of the holding company's home state, without the explicit approval of the state in which the bank is located.

\* \* \* \* \* \*

As the legislative history of the Douglas Amendment indicates, prior to the enactment of the BHC Act, the acquisition and control of banks by bank holding companies was not regulated, and thus bank holding companies could establish networks of subsidiary banks in numerous states, while their subsidiary banks were

---

6. The Board admits that its authority over acquisitions by bank holding companies is intended to supplement the prohibitions set forth in the McFadden Act and to prevent evasion of that Act. *See* 12 C.F.R. § 225.144(e). The Board also acknowledges that the McFadden Act expressly covers the interstate relocation of

a subsidiary bank's main office. *See* 12 C.F.R. § 225.144(i) and (j). Despite the applicability of the McFadden Act to interstate relocations, however, the Board nonetheless maintains that the Douglas Amendment is also intended to apply to relocations.

limited by the McFadden Act [12 U.S.C. § 36] and state law to branching in a single state.

12 C.F.R. §§ 225.144(c) and (e).

The Board's arguments must fail for the simple reason that they presume what they set out to prove and what we have already rejected: that the Douglas Amendment grants the Board authority over bank relocations. As we have already concluded, the clear statutory language and scheme indicate otherwise—the Douglas Amendment language expressly confers on the Board authority over bank acquisitions, as carefully defined in the amendment, not over bank relocations, while section 30 of the McFadden Act expressly places approval of relocations within the province of the OCC.[7]

This is not the first time that the Board has attempted to derive authority from the "plain purpose" of the BHC Act. In several related contexts the Board has asserted authority that it deemed necessary to fulfill its statutory mission; each time the courts have rejected the Board's claim. In *Board of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986), the Board asserted that its authority to regulate institutions that accept "demand deposits," 12 U.S.C. § 1841(c), also gave it authority to regulate institutions that did not formally accept demand deposits but did so as "a matter of practice." 474 U.S. at 367–68, 106 S.Ct. at 685. In support of its authority, the Board argued that the statute should be "read with a view to the 'policy of the regulation as a whole'" and not "read to negate the plain purpose of the legislation." *Id.* at 373, 106 S.Ct. at 688. The Court unequivocally rejected this approach:

The "plain purpose" of legislation ... is determined in the first instance with reference to the plain language of the

statute itself. *Richards v. United States*, 369 U.S. 1, 9, [82 S.Ct. 585, 591, 7 L.Ed.2d 492] (1962). Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action.

\* \* \* \* \* \*

The statute may be imperfect, but the Board has no power to correct flaws that it perceives in the statute it is empowered to administer. Its rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute.

*Id.* 474 U.S. at 373–74, 106 S.Ct. at 688–89. *See also Citicorp v. Board of Governors of Fed. Reserve Sys.*, 936 F.2d 66 (2d Cir. 1991) (BHC Act does not grant Board authority to regulate either bank holding company's subsidiary or subsidiary's subsidiary); *MCorp Fin., Inc. v. Board of Governors of Fed. Reserve Sys.*, 900 F.2d 852 (5th Cir.1990) (BHC Act does not grant Board authority to require bank holding company to transfer funds to subsidiaries), *rev'd on other ground*, —— U.S. ——, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991).

The Board's reasoning in this case differs little from that offered in *Dimension:* in both instances the Board determined that because the express authority included in the BHC Act was insufficient to promote its broad purposes, the Act by implication granted the additional authority needed. We will not, and indeed cannot, allow the Board to do here what the Supreme Court refused to allow it to do in *Dimension.* As the Supreme Court reasoned: "If the Bank Holding Company Act falls short of providing safeguards desirable or necessary to protect the public interest, that is a problem for Congress, and not the Board or the courts, to address." *Dimension*, 474 U.S. at 374, 106 S.Ct. at 689. Thus, even were

---

**7.** We express no opinion on whether the Board could assert authority over relocation of a bank whose acquisition it had approved based on express relocation conditions incorporated in the acquisition approval. *Cf. United States v. Chesapeake & Ohio Ry. Co.*, 426 U.S. 500, 96 S.Ct. 2318, 49 L.Ed.2d 14 (1976). We note,

however, that no such conditions were attached to the 1975 approval of SouthTrust's acquisition of STNB. Nor can the Board argue that the STNB acquisition was subject to the "conditions" set forth in 12 C.F.R. § 225.144 as that section was not adopted until 1985.

we to accept the Board's contention that the purpose of the Douglas Amendment would be thwarted if interstate relocations were not subject to Board approval, the language of the amendment limits the Board's authority and we cannot remove that congressionally imposed limitation.

■ Finally, in an attempt to rescue the Board, Synovus claims the Board derives authority over STNB's relocation from its uncontested authority over SouthTrust's acquisition of the new Alabama bank, SouthTrust Bank of Russell County. According to Synovus, the relocation of STNB and the establishment of the new bank comprised a single transaction each aspect of which was an "integral and necessary element" of the whole. As a consequence, Synovus asserts, the Board had authority over each aspect of the transaction. We disagree. The relocation of STNB and acquisition of SouthTrust Bank of Russell County were apparently related transactions and disapproval of the acquisition might well have dissuaded SouthTrust from proceeding with the relocation. Such a relationship, however, does not make the relocation an acquisition nor does it confer on the Board the approval authority over relocations that Congress failed to grant it. Additionally, Synovus argues that the Board has specific authority to prevent evasions of the Douglas Amendment, see 12 U.S.C. § 1844(b), and that the Board is entitled to act here pursuant to that authority. This argument, however, runs directly contrary to the Board's factual findings which expressly rejected the contention that the relocation was "a subterfuge designed to avoid the restrictions of the Douglas Amendment." JA 3 n. 11. Accordingly, we find no support for Synovus's assertion that the Board's authority is necessary to prevent an evasion of the Douglas Amendment.

### IV.

In sum, we conclude that we have jurisdiction to address SouthTrust's argument that the Board is without authority to regulate a bank holding company's interstate relocation of a "subsidiary bank" and, further, that the Board lacks such authority.[8] Accordingly, the Board's order is

*Vacated.*

SILBERMAN, Circuit Judge, dissenting:

This is a remarkable case that has at its genesis a jurisdictional dispute between the Federal Reserve Board and the Office of the Comptroller of the Currency (OCC). After several rounds of briefing in which we put various questions to the "government," we have before us a range of possible judicial responses. The majority unfortunately has chosen the worst possible course of decision, an erroneous one that does considerable damage to fundamental principles of administrative law. The majority's opinion—declaring unlawful the Board's attempt to apply the Douglas Amendment to the Bank Holding Company Act, 12 U.S.C. § 1842(d), to SouthTrust Corporation's "relocation" into Georgia—is reminiscent for Civil War buffs of Sherman's march through Georgia. `Principles of administrative law are brushed aside like Johnston and Hood's army. Our precedents are overturned like Georgia plantations. And both petitioner Synovus Financial Corporation's and the Board's residual legal positions, not actually placed at issue and therefore properly viewed as noncombatants in this litigation, are treated like the civilians of Atlanta.

At the outset, I think it important to expand on the majority's description of the background to this case. When SouthTrust originally applied to the Comptroller seeking to relocate the main office of SouthTrust National Bank (STNB) from Phenix City, Alabama, to Columbus, Georgia, it proposed to retain STNB's former main office and two existing branches in Russell County, Alabama, as branches of the relocated bank. The State of Georgia opposed SouthTrust's OCC application in part on the ground that the proposed transaction would violate Georgia's policy against interstate branching, see GA.CODE ANN. § 7–1–621(d)(1), and, hence, the McFadden Act, 12 U.S.C. § 36. Apparently in response to Georgia's opposition, SouthTrust amended its OCC application, saying that it would not keep its former main office as a branch and would "dispose" of the Alabama branches and that the assets of these entities would be transferred "to another entity in Alabama." Georgia then withdrew its opposition to SouthTrust's OCC application.

Two months later, SouthTrust also filed (under protest) an application with the

---

8. With all respect to our colleague in dissent, to equate the legal issues in this case with a Civil War campaign manifests not only a misunderstanding of those issues but also a lack of appreciation for a wrenching event in our country's history.

Board to relocate STNB. That application indicated SouthTrust's intention to "form a de novo bank to simultaneously purchase substantially all of the existing assets and all of the deposits of [STNB]"—a reference to the SouthTrust Bank of Russell County (Russell County Bank), an Alabama bank that SouthTrust proposed to organize. Alabama subsequently approved the new bank's charter, and SouthTrust applied to the Board for approval of SouthTrust's acquisition of it. After reviewing submissions from SouthTrust, the State of Georgia, and Synovus, and after the OCC approved the relocation of STNB, the Board approved both the relocation of STNB and SouthTrust's acquisition of the Russell County Bank, referring to the latter as an "integral and necessary element" of the proposed relocation. *SouthTrust Corp.*, 75 Fed.Res.Bull. 516, 518 (1986).

SouthTrust acknowledges in its brief that the Russell County Bank did not ultimately acquire substantially all of STNB's assets, as SouthTrust had repeatedly represented to the Board that it would. SouthTrust restructured the transaction, transferring the great majority of STNB's banking assets to Columbus, Georgia (apparently in response to the Comptroller's conditioning its approval of the relocation on substantial assets and liabilities remaining with STNB in Georgia after the relocation). When the smoke cleared, SouthTrust had managed to establish what looks to all the world like a full service banking operation in Georgia.

As the case was first presented to us by Synovus, the primary issue was whether the Board properly applied the Douglas Amendment in approving the relocation of STNB from Alabama to Georgia. The Douglas Amendment prohibits the Board from approving an application for an acquisition across state lines unless the acquisition is *"specifically* authorized by the statute laws of the State in which [the ac-

quired] bank is located, *by language to that effect and not merely by implication."* 12 U.S.C. § 1842(d) (emphasis added). Synovus argued with great force, supported rather confusingly by the State of Georgia, that Georgia law could not possibly be read as *explicitly* authorizing the transaction.[1] SouthTrust intervened in the action. It supported the Board's interpretation of Georgia law and its application of the Douglas Amendment but alternatively challenged the Board's authority over the transaction on the ground that the move into Georgia was not an "acquisition" under the Bank Holding Company Act but rather only a relocation of SouthTrust's main office.

In 1975 when SouthTrust originally acquired STNB (then the First Bank of Russell County, a state-chartered bank that SouthTrust converted into a national bank and renamed STNB in 1987), it is undisputed that the Board's approval was required, and it was given. At that point SouthTrust apparently gave no indication of any subsequent plans to move its main office across the border into Georgia, and, therefore, that issue was not addressed in the Board's order. In 1985, however, the OCC asserted general authority under the National Bank Act, *see* 12 U.S.C. § 30(b), to authorize national banks to move their main offices up to 30 miles—even across state lines. *See Decision of the Comptroller of the Currency on the Application of Mark Twain Bank, Nat'l Ass'n, Independence, Missouri, to Relocate its Main Office to Overland Park, Kansas, reprinted in* Fed. Banking L.Rep. [CCH] ¶ 86,180 (1985). That is really the *casus belli* in this jurisdictional war between the Comptroller and the Board, of which SouthTrust's effort to move into Georgia is only one battle. The Board, in response to the Comptroller, issued in the same year a regulation to the effect that its approvals of acquisitions of banks under the Bank Holding Company

---

1. It does not seem that the Georgia "Regional Interstate Banking" statute, Ga.Code Ann. § 7–1–620 to –626, *specifically* authorizes the STNB relocation. The statute allows a "Southern Region bank holding company" such as SouthTrust to "acquire ... a Georgia bank" under certain specified conditions, *id.* § 7–1–621(a)(3), but "no ... Southern Region bank holding company may ... [d]irectly or indirectly acquire a Georgia bank unless such bank has been in existence and continuously operated as a bank for a period of five years or more prior to the date of application [for approval]," *id.* § 7–1–621(d)(2). Putting aside the question whether the term "acquire" can ever be construed to encompass relocations, the transaction at issue

in this case certainly did not involve the acquisition of "a Georgia bank." The statute defines "Georgia bank" as a bank "having banking offices located only in [Georgia]," *id.* § 7–1–620(7), and STNB was operating in Alabama, not Georgia, when SouthTrust sought approval for the transaction. Furthermore, section 7–1–621(d)(2) may be read to require the acquiree bank to have operated "as a bank" *in Georgia* for at least five years prior to the acquisition, a requirement STNB obviously did not fulfill. Whatever the intent of the Georgia legislature, the Douglas Amendment's requirement of *specific* authorization does not appear to have been satisfied.

Act—*including prior approvals*—were subject to the continuing condition that the acquired bank not attempt to move to another state after the acquisition was completed. *See* 12 C.F.R. § 225.144. It was this regulation that the Board relied upon to insist that SouthTrust seek the Board's approval before moving STNB's main office, notwithstanding the Comptroller's blessing.

SouthTrust's alternative argument, as intervenor, challenged the Board's regulation as exceeding the Board's authority under the Bank Holding Company Act. SouthTrust argues that whatever authority the Board may have had to condition SouthTrust's acquisition of STNB when it approved that acquisition in 1975, the Board did not have continuing authority to prevent the relocation of STNB's main office more than a decade later. According to SouthTrust, the Comptroller enjoys authority under the National Bank Act to permit the relocation of a main office of a national bank within 30 miles, even across state lines, and the Board is powerless to object.

The Board (and Synovus) objected strenuously to SouthTrust's alternative argument, claiming that SouthTrust, as the beneficiary of the Board's order, was not aggrieved and therefore could not challenge the Board's authority to issue its regulation. It was also argued that SouthTrust as an intervenor could not raise a new issue (that is, an issue not presented to this court by any other party) after the time to file a petition for review had passed.

The Board's brief was filed by, among other persons, an Assistant Attorney General. At oral argument, however, it became apparent that the Justice Department had not taken a position as between the Board and the Comptroller, and, therefore, that the Comptroller's position was not represented. We asked for the Comptroller's views in a supplemental brief after oral argument.[2] After several extensions of time, the Justice Department filed a supplemental brief in the name of the "United States," stating that "[n]either the Board nor the Comptroller will submit a separate brief."

The government contended that the Board, in its decision approving the relocation of STNB and the acquisition of Russell County Bank, incorrectly construed the Douglas Amendment to impose an implicit condition on Board approvals of acquisitions against the holding company subsequently moving the acquired bank across state lines, *"such that violation of this condition would require a new application"* (emphasis added). That is, according to the government, the Board erred in concluding that "the original approval granted by the Board to SouthTrust to acquire STNB" in 1975 was limited to SouthTrust's owning and operating STNB in Alabama and that any subsequent relocation of STNB to another state would "require[ ] additional Board approval." The government took pains to explain that a different question would be presented if the Board had asserted authority to impose "an explicit interstate condition" at the time of its original approval of SouthTrust's acquisition of STNB. Nor did the government address the validity of section 225.144, saying that it would also be a different case "if the Board had chosen another *means* to enforce its asserted implicit condition ...., such as a cease and desist order, to prevent an evasion of the [Bank Holding Company] Act" (emphasis added). Section 225.144 rests in part on the Board's statutory authority to prevent evasions of the Bank Holding Company Act, *see* 12 U.S.C. § 1844(b); 12 C.F.R. § 225.144(k), and, according to the government, a cease and desist order would afford procedural protections not available if the Board simply holds a prior approval invalid. In other words, the government did not directly contest the regulation establishing the Board's authority under the Douglas Amendment over relocations of holding companies' subsidiary banks. Rather, it limited its objection to the *procedure* the Board employed to enforce its interpretation of the Douglas Amendment in this case.

Accordingly, the government did not assert that the Douglas Amendment's language dealing with "acquisitions" could not extend to a relocation, nor did the government argue that no implied conditions could attach to a Board approval of an acquisition under any circumstances. Indeed, the government pointed out in a footnote that the Solicitor General was simultaneously (that day) seeking *certiorari* in *MCorp Financial, Inc. v. Board of Governors*, 900 F.2d 852 (5th Cir.1990), *rev'd in relevant part*, —— U.S. ——, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991), in which the Fifth Circuit disapproved the Board's similar position that bank holding companies are sub-

---

**2.** In a separate statement I requested that the administration take the same position that it would take in the Supreme Court if the case were there.

ject to a condition implicit in all approvals of bank acquisitions requiring bank holding companies to serve as continuous "source[s] of strength" to their subsidiary banks, that is, that the Board can require holding companies to provide financial support to their subsidiaries. *Id.* at 860. In *MCorp* the Board had asserted its authority to enforce such an implied condition in part under 12 U.S.C. § 1844(b).[3] Finally, the government emphasized that there was no need for us to reach all of the issues outlined in its brief. It particularly urged us not to attempt to resolve the regulatory "turf" dispute between the Board and the Comptroller (which was apparently moderating), pointing out that no one had appealed to us the Comptroller's order permitting SouthTrust to move its headquarters.

Faced with this extraordinary brief from the United States, which was quite different in its position from anything we had seen previously from any party—and to which the Board had apparently agreed not to respond—we issued a show cause order asking why, if we found it necessary to reach the issue of the Board's continuing authority over SouthTrust's relocation of its main office, we should not remand the case to the Board. The United States responded that, in that event, we should indeed remand to the Board with directions to reconsider the issue of the Board's authority. The government pointed out that the Board should be given an opportunity to consider the "ramifications" of the position set forth in the United States' supplemental brief because the Board is the agency to which Congress delegated the implementation of the Bank Holding Company Act and to which, of course, we owe deference as to the interpretation of that Act. The government further observed that the Board might take other steps to carry out the policy of the Douglas Amendment, and, moreover, had available in this case an alternative theory of jurisdiction raised by Synovus in its reply brief but not yet considered by the Board: that the Board's "undisputed jurisdiction over SouthTrust's acquisition of the SouthTrust Bank of Russell County," the Alabama bank established to assume STNB's assets, might give the Board authority to apply the Douglas Amendment to the move into Georgia as part of an integrated transaction. The government gently suggested that it would be inappropriate for us to decide that issue as well because the Board had not addressed it.

At that point, we had before us numerous questions, but surely the most important was whether or not we should determine whether the Board had authority over this transaction. I think the answer, for a number of reasons, is clearly no: we should not decide this issue on this record at this time. I would remand the case to the Board without opinion.

## II.

It seems common ground (in a case where there is precious little) that in order for us to reach the intervenor's alternative authority argument, we must conclude that SouthTrust is "aggrieved" by the Board's order. Under 12 U.S.C. § 1848, "[a]ny party aggrieved by an order of the Board" under the Bank Holding Company Act may seek judicial review. Although intervenors need not always show aggrievement, *see, e.g., International Union, UAW, Local 283 v. Scofield,* 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965), when an intervenor seeks to raise an issue not raised by any other party in the case, it must demonstrate injury to itself, or the concrete adverseness necessary for Article III jurisdiction does not exist.

SouthTrust, however, is in high clover; it has successfully moved its main office across the border into Georgia, and, from what we can determine, is operating there. It is doing so with the Board's blessing and approval. SouthTrust has not claimed that the Board did not give it everything it wished; how then, can it possibly be thought that SouthTrust is aggrieved by the Board's order? As this court has recently reiterated, "[i]t is the general rule that a party may not appeal from a disposition in its favor." *Showtime Networks Inc. v. FCC,* 932 F.2d 1, 4 (D.C.Cir.1991); *see also United States Office of Personnel Management v. FLRA,* 905 F.2d 430, 435 (D.C.Cir.1990) (Silberman, J., concurring) (parties successful before the agency did not become aggrieved until the agency

**3.** In *MCorp,* the Board also supported its "source of strength" regulation under the Financial Institutions Supervisory Act, *see* 12 U.S.C. § 1818(b), which authorizes the Board to begin cease and desist proceedings against a bank holding company that engages in "an unsafe or unsound practice." *MCorp,* 900 F.2d at 862–63.

The Supreme Court granted *certiorari* to review the entire action, but, deciding that the district court lacked jurisdiction, did not reach the merits of *MCorp*'s challenge to the regulation. *See Board of Governors v. MCorp Financial, Inc.,* —— U.S. ——, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991).

changed its position after a second remand from the court).

We have explicitly held that an intervenor who receives approval of a requested application from the Board is not a party aggrieved merely because it wishes also to challenge the Board's authority over the transaction. *See National Ass'n of Casualty & Sur. Agents v. Board of Governors,* 856 F.2d 282, 284 n. 1 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1090, 109 S.Ct. 2430, 104 L.Ed.2d 987 (1989) (*NASCA*). SouthTrust suggested that *NASCA* might be distinguishable because there we affirmed the Board's rationale for approving the transaction, *see id.* at 286–91, whereas here, *if* we agreed with Synovus that the Board botched the application of the Douglas Amendment (because Georgia law was at best ambiguous), we should, as a matter of judicial economy, take up SouthTrust's alternative authority argument. This is so because at that point—almost like a springing use—SouthTrust would be aggrieved by the Board's order. This logic assumes, of course, that the Board would necessarily turn around and disapprove the relocation if we rejected the Board's interpretation of Georgia law, and it is on the basis of this assumption that SouthTrust claims injury before us.

I doubt this kind of assumption is ever called for, since it requires us to anticipate agency action, which is quite inappropriate for a federal court to do. *See SEC v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). In this case, however, after the extraordinary post-argument briefing, which leaves us quite unsure whether and under what theory the Board would attempt on remand to assert authority over this transaction, such an assumption seems at least speculative and more likely far-fetched. Nevertheless, the majority's assertion that "[i]f we were to agree that the Board's view of Georgia law was wrong, we would needlessly prolong this extended controversy by sending the case back to the Board only to have it return to us on SouthTrust's petition after the Board exercised its disputed authority to block the relocation," Maj.Op. at 433–34, is based on this dubious assumption.

Remarkably, however, the majority does not proceed under SouthTrust's own theory of aggrievement, because the majority *does not decide* the question whether the Board erred in construing Georgia law under the Douglas Amendment. SouthTrust's theory is put to the side almost as an unwelcome distraction. The majority instead discovers a ground for SouthTrust's aggrievement that apparently did not occur to South-Trust—an injury, in other words, that SouthTrust unknowingly suffered.

As the majority puts it, "[i]t now appears that SouthTrust's victory before the Board was illusory ... [because t]he Board's final order was expressly conditioned on South-Trust obtaining 'necessary approvals from the Georgia Commissioner of Banking and Finance under the Georgia interstate banking statute regarding [STNB].' " Maj.Op. at 432 (quoting J.A. at 3). After examining Synovus' reply brief (a most unusual document from which to glean SouthTrust's standing), the majority concludes that *if this court affirms the Board,* it is likely that Georgia will require an application from SouthTrust and will deny it. *See* Maj.Op. at 432. Putting aside the extraordinary nature of a suggestion that a party is injured for a reason that is not apparent to the party, *cf. FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990) ("[I]t is the burden of the 'party who seeks the exercise of jurisdiction in his favor' ... 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.' " (citations omitted)), the majority's analysis seems quite muddled to me.

As an initial matter, I think the majority misstates Georgia's position. For whatever reason (the record suggests conflicts between divisions of the Georgia government, a situation not unusual in these bank regulatory cases, *see, e.g., NASCA,* 856 F.2d at 290), Georgia was content to argue originally that the transaction was not specifically permitted by Georgia law so that the Board could not approve the transaction under the Douglas Amendment. Georgia has still not squarely stated whether it would necessarily invalidate this transaction. The Board's position, of course, preserves various options for the State of Georgia. And we certainly cannot anticipate which option the State will pursue. Indeed, if Georgia wishes affirmatively to prevent SouthTrust's entry under Georgia law, I cannot see why the Board's approval of the transaction is of any significance at all. Whether or not the Board expressly conditioned its approval on SouthTrust also obtaining approval from the Georgia authorities, Georgia certainly retained its power to object to the transaction. *See* 12 U.S.C. § 1846 ("No provision of this Chap-

ter shall be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with respect to companies, banks, bank holding companies, and subsidiaries thereof."); *Lewis v. BT Invest. Managers, Inc.,* 447 U.S. 27, 49, 100 S.Ct. 2009, 2022, 64 L.Ed.2d 702 (1980) (stating that section 1846 "was intended to preserve existing state regulations of bank holding companies"). Since the Board conditioned its approval on Georgia's authority to object, it appears that the Board's order left Georgia as free to act—certainly vis-à-vis the Board—as if the Board had never exercised authority over the proposed transaction in the first place. Essentially, all the Board did was tell the world (and in particular the Comptroller) that it had authority over the transaction and then did not really exercise it (in the actual case, too cute by half). For that reason, presumably, the majority suggests that SouthTrust will be injured not by the Board's order, but by an order of this court affirming the Board's order. The statute, however, requires SouthTrust to be aggrieved by the Board's order *before* it bestows jurisdiction on this court to hear SouthTrust's claim. Under the majority's theory, SouthTrust could just as well claim it is aggrieved under section 225.144 by my prospective dissent.

I freely admit, as should be apparent, that I do not understand the majority's reasoning setting forth the nature of SouthTrust's injury or aggrievement, but I am even more at a loss to comprehend the next few paragraphs of its opinion, *see* Maj.Op. at 432–34, which seem to set forth a new theory of federal appellate review of administrative agency decisions, a theory which equates such review with appeals from a district court and which, if followed,

would mean the elimination of numerous administrative law and separation of powers doctrines. All of this is to no avail, it seems, because the principle that a successful party lacks standing to appeal applies to those who receive favorable district court judgments as well as to those who prevail before agencies. *See Deposit Guaranty Nat'l Bank v. Roper,* 445 U.S. 326, 333, 100 S.Ct. 1166, 1171, 63 L.Ed.2d 427 (1980) ("A party who receives all that he has sought [from the district court] generally is not aggrieved by the judgment affording the relief and cannot appeal from it.").

The essence of the majority's reason for reaching and deciding the question of the Board's authority is its view that whether or not SouthTrust is "aggrieved" under the statute, it makes sense to permit South-Trust to raise the authority issue because SouthTrust is not an "intermeddler." Maj. Op. at 433. Perhaps—but are we not bound by section 1848 and by the Constitution to determine first whether SouthTrust is aggrieved before listening to its claim? [4]

## III.

Wholly apart from the question whether SouthTrust is "aggrieved," SouthTrust is indisputably an intervenor, and as an intervenor, it is well-settled that SouthTrust may not raise an issue raised by no other party before this court. Every other circuit that has addressed the question has held that an intervenor cannot raise new issues in an administrative review proceeding without filing a separate petition for review. *See United Gas Pipe Line Co. v. FERC,* 824 F.2d 417, 435 (5th Cir.1987); *Illinois Bell Tel. Co. v. FCC,* 740 F.2d 465, 477 (7th Cir.1984); *Bath Iron Works Corp. v. White,* 584 F.2d 569, 573 n. 2 (1st Cir. 1978).[5] The majority, however, relies on

**4.** Even were the majority correct that the procedural rules governing intervention—Federal Rule of Appellate Procedure 15(d) and D.C.Circuit Rule 11—do not prohibit us from reaching SouthTrust's claim, those rules obviously would not render Article III any less applicable. But our local rules do *not* encourage intervenors to raise claims such as SouthTrust's, as the majority implies. *See* Maj.Op. at 432–34. D.C.Circuit Rule 11 directs intervenors in their briefs to focus on points or arguments not made by the party the intervenor supports. *See* D.C.Cir.R. 11(e)(2). New *arguments,* which the rule encourages, are not the same as new *issues,* which the rule plainly forbids. *See id.* ("[The intervenor's brief] shall avoid repetition of facts or legal arguments made in the principal (appel-

lant/petitioner or appellee/respondent) brief, and shall focus on points not made or adequately elaborated upon in the principal brief *although relevant to the issues before this Court.*" (emphasis added)).

**5.** The majority's misplaced reliance on the principles governing review of district court judgments is unavailing here, for it is equally well-settled that, as a general rule, a party already before the court as an appellee cannot raise a new challenge to the judgment without filing a separate cross-appeal. *See Morley Constr. Co. v. Maryland Casualty Co.,* 300 U.S. 185, 191, 57 S.Ct. 325, 328, 81 L.Ed. 593 (1937) ("Without a cross-appeal, an appellee may 'urge in support of a decree any matter appearing in the

*California Public Broadcasting Forum v. FCC,* 752 F.2d 670 (D.C.Cir.1985) (*CPBF*), where we (in language that was unnecessary to our disposition of the case because we struck the intervenor's brief) rejected this view.[6] *See id.* at 683 & n. 10. Subsequent to our decision in *CPBF,* however, in *Illinois Bell Telephone Co. v. FCC,* 911 F.2d 776 (D.C.Cir.1990), we held that "[a]n intervening party may join issue only on a matter that has been brought before the court by another party." *Id.* at 786.

The majority would distinguish *Illinois Bell* primarily because here the issue the intervenor would raise "is 'an essential' predicate to the question whether the Board properly interpreted Georgia law." Maj.Op. at 434 (quoting *Vance v. Terrazas,* 444 U.S. 252, 258 n. 5, 100 S.Ct. 540, 544 n. 5, 62 L.Ed.2d 461 (1980) (interpreting Supreme Court rules of practice)). I think that by "essential predicate" the majority means simply that if the Board's authority over the transaction had been raised by a petitioner, we would logically have reached that issue first—but it was not. If the issue had not been raised at all, we surely would not consider it *sua sponte;* it does not bear on *our* jurisdiction.

The majority also asserts that our holding in *Illinois Bell* was prudential, not jurisdictional, and should not be applied categorically. *See* Maj.Op. at 434. That proposition is certainly not apparent from an examination of the *Illinois Bell* opinion. We explained, as the reason for the rule, that "[o]therwise, the time limitations for filing a petition for review ... could easily be circumvented through the device of intervention." *Illinois Bell,* 911 F.2d at 786. Time limitations on petitions for review are, of course, jurisdictional. *See INS v. Pangilinan,* 486 U.S. 875, 883–85, 108 S.Ct. 2210, 2215–16, 100 L.Ed.2d 882 (1988). Thus, in *Simmons v. ICC,* 716 F.2d 40 (D.C.Cir.1983), we dismissed for lack of jurisdiction an intervenor that was required to show an independent jurisdictional basis (in order to continue an appeal; the petitioner

in that case had been dismissed on different jurisdictional grounds), since the intervenor had failed to comply with the statutory deadline for filing petitions for review—a requirement that " 'is jurisdictional in nature, and may not be enlarged or altered by the courts.' " *Id.* at 46 (quoting *Natural Resources Defense Council v. NRC,* 666 F.2d 595, 602 (D.C.Cir.1981)); *accord Process Gas Consumers Group v. FERC,* 912 F.2d 511, 514–15 (D.C.Cir.1990) (per curiam); *Alabama Power Co. v. ICC,* 852 F.2d 1361, 1366–68 (D.C.Cir.1988). The rule applied in *Illinois Bell* is jurisdictional for the same reason. The majority in this case, as it does with respect to *NASCA,* therefore appears to me simply to run over our most direct precedent.

As a policy matter, the majority argues that a "categorical[ ]" application of the rule applied in all other circuits that have considered the issue, as well as by this court in *Illinois Bell,* "would lead to absurd results" because a prevailing party such as SouthTrust has no particular incentive to file a petition for review unless the losing party does. Maj.Op. at 434. Therefore, if we were to adhere to our *Illinois Bell* holding, our docket would be cluttered with "protective" petitions filed by parties like SouthTrust. Implicit in the majority's reasoning, it should be noted, is its concession that SouthTrust was *not* actually aggrieved by the Board's order. The problem the majority foresees, after all, is only relevant with respect to parties who have won before the agency but would like to raise an alternative winning argument before the court. Unlike an appeal from the district court (which the majority continually confuses with review of agency action), however, we cannot consider an argument not relied on by the agency. *See Chenery,* 318 U.S. at 87–88, 63 S.Ct. at 459. And even in a case such as this, where the Board rejected SouthTrust's authority argument, we cannot, as I have said above, anticipate the agency's next step. To do so interferes with the agency's primary deci-

---

record'.... What he may not do in the absence of a cross-appeal is to attack the decree...." (quoting *United States v. American Ry. Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924))). *But see Spann v. Colonial Village, Inc.,* 899 F.2d 24, 32–33 (D.C.Cir.) (finding the confusing procedural posture of a case to constitute "exceptional circumstances" excusing a party's failure to file a cross-appeal), *cert. denied,* —— U.S. ——, 111 S.Ct. 509, 112 L.Ed.2d 521 (1990).

6. The other cases on which the majority relies are inapposite. *Spann* recognized a limited exception for unusual procedural circumstances not present here, *see Spann,* 899 F.2d at 32–33, and, in any event, was not an agency review case. In *New South Media Corp. v. FCC,* 644 F.2d 37 (D.C.Cir.1981) (per curiam), it is not clear whether the intervenor, like SouthTrust, sought to raise issues different from those already before the court.

sionmaking authority and trenches on separation of powers.

I rather doubt that we have seen many "protective" petitions since our *Illinois Bell* decision or that the other circuits following the rule have either. And I cannot imagine why we should be concerned with a cluttered docket composed of petitions that were only filed for protective reasons and would be dropped if no other party petitioned for review. The majority's "noncategorical" approach, by contrast, promises a good deal of confusion, because litigants will not know when an intervenor can succeed in bringing a new claim before the court. Under the majority's rule, intervenors planning both to support and to challenge agency decisions can conceal their intentions, thereby frustrating the agency's efforts to mount a complete defense.

In any event, even if the majority is correct that under *CPBF* we have discretion to decide whether to entertain South-Trust's authority argument, it is hard for me to imagine a case where prudence would point more strongly towards restraint.[7] After all, the Board, as the government has pointed out, has not even responded to the government's interpretation of the Douglas Amendment, and it remains unclear whether the Board, following a remand from this court, would reassert its authority over the relocation of STNB at all. *Cf. State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir. 1986) (under ripeness doctrine a court may "properly deem a matter unfit for resolution if ... 'further administrative action is needed to clarify the agency's position,' ... or ... resolution of the dispute is likely to prove unnecessary." (quoting *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C.Cir.1986)) (other citations omitted)), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). In the meantime, SouthTrust, who, as intervenor, supported the Board's order—and

only alternatively challenged the Board's authority—is operating in Georgia facing no immediate threat from the Board. *Cf. id.* at 479–80 ("[F]or an institutional interest in deferral to be outweighed, postponing review must impose a hardship on the complaining party that is immediate, direct, and significant.... 'The mere *potential* for future injury,' moreover, is not enough." (quoting *Alascam, Inc. v. FCC*, 727 F.2d 1212, 1217 (D.C.Cir.1984)) (emphasis in original)).

## IV.

Nevertheless, the majority, like a heat-seeking missile (which even Sherman did not have), has zoomed by and through all obstacles that I believe dictate restraint to decide whether the Board has authority over the transaction that resulted in South-Trust's move of its main office across the Georgia line. I think this issue is difficult and that there is a good deal more to say about it than does the majority—as witness, the Supreme Court's grant of *certiorari* in *MCorp*. The United States, in its supplemental brief, is not entirely convincing in distinguishing from this case its support for the Board's implied condition authority in *MCorp*, in which the Board asserted the authority to require bank holding companies to provide financial support to subsidiary banks under an implied condition on the Board's acquisition approval. The implied condition against subsequent interstate relocations at issue here could be thought even easier to justify than the "source of strength" condition involved in *MCorp*. A continuing condition against relocations is much less open-ended than a condition that allows the Board sometime in the future to require the holding company to provide the acquired subsidiary with some unspecified amount of capital. Still, as I have indicated, I do not think it appropriate to attempt to resolve the question.

Not only does the majority determine the issue, it explicitly relies on the Comptrol-

---

**7.** Even under *CPBF* it seems inappropriate for us to address SouthTrust's alternative claim. *CPBF* requires that for the reviewing court to reach a new issue presented by an intervenor after the deadline for filing a petition for review has passed, the other parties must have adequate notice of the intervenor's intention to raise that issue, *see CPBF*, 752 F.2d at 683—a requirement the majority ignores. Although it declined to define adequate notice, the *CPBF* court found the notice given in that case insuffi-

cient because the intervenor's *notice of intervention* did not clearly indicate that new issues would be raised. *See id.* To be sure, in our case the Board was ultimately permitted to file a reply brief in response to SouthTrust's authority arguments. But SouthTrust's notice of intervention, which simply stated that "the interests of SouthTrust and the Board are not coincident in all respects," provided at best only the vaguest hint that SouthTrust intended to challenge the Board's authority.

ler's authority to approve the relocation of bank main offices under the National Bank Act, one of the many questions that the government asked us not to reach. To rub salt in Synovus' wounds, the majority actually goes so far as to decide the question that Synovus raised—*but the Board has never decided*—that is, whether the Board has authority over the whole transaction, including the move of STNB into Georgia, because of its authority over the acquisition of the newly established Russell County Bank, which, it will be recalled, the Board described as "an integral and necessary element" of the relocation. The majority decides this issue, notwithstanding that the United States urged that we remand rather than reach the authority issue in part because this alternative ground for the Board's authority might be available.

Finally, just so there cannot be a breath of life left to the Board's (and Synovus') position, the majority gratuitously holds that the Board cannot attempt to regulate this transaction as an evasion of the Douglas Amendment, which was one of the statutory sources of authority upon which the Board rested its regulation. To be sure, the majority is correct that the Board found that SouthTrust did not *intend* to evade the Douglas Amendment, *see* Maj. Op. at 436–37, but that does not foreclose the Board from determining that relocations for some period after approval of an acquisition are, by law, evasions of the Douglas Amendment regardless of subjective intent.

Accordingly, I would remand the case to the Board without opinion,[8] and, therefore, respectfully dissent.

## ORDER

March 27, 1992.

Before: MIKVA, Chief Judge, WALD, EDWARDS, RUTH B. GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, HENDERSON, and RANDOLPH, Circuit Judges.

Petitioner's Suggestion for Rehearing *En Banc* and the responses thereto have been circulated to the full Court. No mem-

ber of the Court requested the taking of a vote thereon. Upon consideration of the foregoing, it is

ORDERED, by the Court *en banc*, that the suggestion is denied.

Separate statement filed by Circuit Judge SILBERMAN, with whom Circuit Judge WILLIAMS and Circuit Judge D.H. GINSBURG join, concurring in the denial of rehearing en banc.

SILBERMAN, Circuit Judge, with whom Circuit Judge WILLIAMS and Circuit Judge D.H. GINSBURG join, concurring in the denial of rehearing en banc:

Petitioner argues that the panel opinion is in conflict with our own cases on two issues of considerable importance. First, the panel permitted an intervenor to raise a claim—that the Federal Reserve Board lacked legal authority over the transaction—that was not otherwise put in issue and that was raised after the time for a petition for review had expired. That result would appear to conflict with this court's recent opinion in *Illinois Bell Telephone Co. v. FCC*, 911 F.2d 776 (D.C.Cir. 1990), which held that "[a]n intervening party may join issue only on a matter that has been brought before the court by another party," *id.* at 786, as well as with the decision of every other circuit that has addressed this situation, *see United Gas Pipe Line Co. v. FERC*, 824 F.2d 417, 435 (5th Cir.1987); *Illinois Bell Tel. Co. v. FCC*, 740 F.2d 465, 477 (7th Cir.1984); *Bath Iron Works Corp. v. White*, 584 F.2d 569, 573 n. 2 (1st Cir.1978). Relying on arguably unnecessary language from an earlier case, *California Public Broadcasting Forum v. FCC*, 752 F.2d 670, 683 & n. 10 (D.C.Cir.1985), the panel modified the jurisdictional rule established by *Illinois Bell* and adopted a "flexible approach" that may well create uncertainty whenever an intervenor attempts to bring a new claim before the court. *Cf. Lamprecht v. FCC*, No. 88–1395, slip op. at 14, 1992 WL 27168 (D.C.Cir. Feb. 19, 1992) (reading *Synovus* to permit intervenors to raise new issues only "in extraordinary cases"). Second, the panel's determination that the inter-

---

8. I see no need to decide the issue originally raised by Synovus—whether the Board correctly interpreted Georgia law as specifically authorizing the proposed transaction—because it is un-

clear whether the Board on remand would seek to exercise jurisdiction over the transaction under any theory.

venor was aggrieved under the Bank Holding Company Act, 12 U.S.C. § 1848, notwithstanding its victory before the Board, appears in conflict with our holding in *National Association of Casualty & Surety Agents v. Board of Governors*, 856 F.2d 282, 284 n.1 (D.C.Cir.1988) (intervenor whose application had been approved by the Board could not challenge the Board's order because it was not aggrieved), *cert. denied*, 490 U.S. 1090, 109 S.Ct. 2430, 104 L.Ed.2d 987 (1989), and in tension with the well-settled rule that prevailing parties cannot appeal decisions in their favor. *See, e.g., Showtime Networks Inc. v. FCC*, 932 F.2d 1, 4 (D.C.Cir.1991).

The government, however, tells us that the Board, in an unrelated case, has reconsidered its authority over bank relocation transactions and has determined that, "except in the case of an evasion of the [Bank Holding Company] Act, the Board will no longer require an application under the Act by a bank holding company that plans to relocate a subsidiary bank across a state line.... The Board also decided to rescind its policy statement (12 C.F.R. § 225.144) that states an application is required in such circumstances." There is not much substance left, then, to the dispute that gave rise to this controversy. *Cf. Athridge v. Quigg*, 852 F.2d 621, 623 n. 3 (D.C.Cir. 1988) (per curiam) (challenge to soon-to-be-abolished regulation survives mootness inquiry while regulation remains in effect). Thus, despite the serious claims petitioner raises, the case is not *en banc* worthy. The government, which surely would be the party most interested in these issues generically, wishes to reserve its position on the questions presented in the rehearing petition for another case, and so should the court.