COMSAT CORPORATION, Petitioner

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents

TRW Inc., et al., Intervenors.

No. 95–1057.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1996.

Decided March 15, 1996.

William T. Lake, Washington, DC argued
the cause for petitioner, with whom J. Roger
Wollenberg, Warren Y. Zeger, and Neal T.
Kilminster, were on the brief. John H. Har-
wood, II, entered an appearance.

John P. Stern, Counsel, Federal Communi-
cations Commission, Washington, DC argued
the cause for respondents, with whom Wil-
liam E. Kennard, General Counsel, Daniel M.
Armstrong, Associate General Counsel, John
E. Ingle, Deputy Associate General Counsel,
Anne K. Bingaman, Assistant Attorney Gen-
eral, United States Department of Justice,
Robert B. Nicholson, and Mark S. Popofsky,
Attorneys, were on the brief. Julius Gena-
chowski, Counsel, Federal Communications
Commission, entered an appearance.

Alfred M. Mamlet, Washington, DC, ar-
gued the cause for intervenors, with whom
Philip L. Malet, Norman P. Leventhal, Raul
R. Rodriguez, Robert S. Koppel, and Richard
S. Whitt, were on the joint brief. Robert J.
Aamoth, Stephen Baruch, Bruce D. Jacobs,
and Lon C. Levin, entered appearances.

Before: SILBERMAN, BUCKLEY, and
ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit
Judge SILBERMAN.

SILBERMAN, Circuit Judge:

COMSAT petitions for review of a Federal Communications Commission declaratory order concerning its provision of land-mobile satellite service through a corporation affiliated with the Inmarsat treaty organization. Since the order is not ripe for review, we dismiss the petition.

## I.

This case arises out of the ever-expanding scope of services provided by Inmarsat, the International Maritime Satellite Organization.[1] Inmarsat derived from an international conference called to deal with perceived obstacles to establishing viable commercial satellite service for maritime use. The conference led to a convention and an operating agreement. Each nation that is a party to the convention designates a signatory, which can be either private or governmental, to assume the responsibilities set forth in the operating agreement. Signatories hold financial stakes in Inmarsat and are responsible for funding Inmarsat's capital requirements in proportion to their investment share. The signatories then enjoy the right to provide Inmarsat space segment services to third parties.

The Inmarsat agreements entered into force in July 1979. The year before, Congress enacted the International Maritime Satellite Telecommunications Act, 47 U.S.C. §§ 751–757 (1991), to provide for the United States' participation and to designate petitioner COMSAT as "the sole operating entity of the United States for participation in INMARSAT, for the purpose of providing international maritime satellite telecommunications services." *Id.* § 752(a)(1).[2] Under the Act, petitioner is subject to FCC oversight of its Inmarsat activities. It must apply to the FCC before it may provide any Inmarsat service and before it may fund any Inmarsat capital requirement.

Since its creation, Inmarsat's services, and consequently COMSAT's participation, have expanded beyond the provision of maritime services. In 1989, amendments to the Inmarsat agreements permitted Inmarsat to provide service to aeronautical users over its satellite system. Also in that year, amendments were adopted—though as of this writing they have not yet entered into force—that would allow Inmarsat's mission to extend to the provision of land-mobile satellite service. Inmarsat's latest proposed venture, Inmarsat—P, is a system of new satellites that will be deployed in an "intermediate circular orbit" and provide "voice, facsimile, and data service with global coverage" to "not only maritime users, but also international business travelers, small aircraft, and 'quasi-fixed' commercial, industrial, and governmental users in remote areas where there are no terrestrial alternatives." *Motorola Satellite Communications, Inc.,* 9 F.C.C. Rcd 7693, 7695 (1994) (*Inmarsat—P Order*). It is to be implemented through an Inmarsat affiliate, in which Inmarsat as well as a number of signatories will have ownership interests. The affiliate, ICO Global Communications (Holdings) Limited (ICO), to be sure, will offer Inmarsat–P services to maritime users, but it is expected to offer services to a substantially greater number of non-maritime users.

Motorola, a likely competitor of the Inmarsat–P system, sought in 1993 a declaratory ruling from the Commission that COMSAT was not authorized under the Act to provide domestic or international land-mobile satellite service over the Inmarsat–P system, and that it was not in the public or national interest for COMSAT to participate in Inmarsat–P "in light of the substantial private U.S. commercial interest in developing similar mobile satellite systems." After receiving comments on the petition, the Commission issued the *Inmarsat–P Order,* of which review is sought here. The Commission reiterated that COMSAT's legal authority under the Maritime Satellite Act extended only to the provision of maritime services. The FCC

---

1. The entity has changed its name to the International Mobile Satellite Organization, but apparently the acronym remains the same.

2. The Communications Satellite Act of 1962 had established COMSAT as a private, for-profit corporation charged with fulfilling American responsibilities under the treaty that established the Intelsat satellite organization.

emphasized the ubiquitousness of the term "maritime" in the language of the Act and noted legislative history indicating that COMSAT's status as signatory to the Intelsat and Inmarsat organizations was not to ordain COMSAT's role in any future satellite organization that might provide *different* services. COMSAT could provide non-maritime services through Inmarsat, the Commission acknowledged—as it had indicated in earlier orders—but only to the extent that they were "ancillary to and supportive of" Inmarsat's maritime services.[3]

COMSAT's participation in Inmarsat–P, in the Commission's view, would not meet that test. Indeed, Inmarsat–P appeared likely to compete with rather than support Inmarsat's own maritime service. And Inmarsat–P could hardly be regarded as *ancillary* to Inmarsat's maritime operations because the outlays for the Inmarsat–P system would be larger than all Inmarsat expenditures to date, and Inmarsat–P's subscribership was projected to dwarf that of Inmarsat by 50 times, with substantially more non-maritime than maritime users. The Commission did not, however, close the door on COMSAT's participation in Inmarsat–P. COMSAT had long enjoyed the ability to participate in activities entirely apart from Intelsat so long as those activities were "not inconsistent with, and [did] not hinder or interfere with the [Communications Satellite Act's] purposes and objectives." [4] *Inmarsat–P Order* at 7710 (quotations omitted). The Commission, applying this standard to the Inmarsat context, stated that COMSAT's participation in Inmarsat–P could be approved under this "not inconsistent" standard if ICO could be structured as a non-Inmarsat venture. If ICO "would extend COMSAT's statutory exclusive status within Inmarsat," then the Commission would evaluate it under the "ancillary to and supportive of" standard. *Id.* at 7711. If, however, the proposed venture were of a kind in which any "similarly disposed and similarly qualified" private entity could participate, then COMSAT's partic-

ipation would be approved so long as it were "not inconsistent" with COMSAT's statutory obligations. *Id.*

Shortly after the *Inmarsat–P Order* and while COMSAT's petition for review of it was pending, yet another would-be competitor of COMSAT, TRW Inc., sought an order prohibiting COMSAT from supporting or investing in the Inmarsat–P affiliate. The petition was denied, but the Commission directed COMSAT to file an application by May 1, 1995, demonstrating Inmarsat–P's "structural compliance with the *[Inmarsat—P Order.]*" In re: *Participation by COMSAT Corporation in a New Inmarsat Satellite System Designed to Provide Service to Handheld Communications Devices,* 10 F.C.C.Rcd 1061, 1065 (1995). COMSAT filed its application, contending that Inmarsat's procurement of Inmarsat–P facilities was authorized by the Act and, in any event, that ICO had been structured sufficiently removed from Inmarsat so as to meet the Commission's "not inconsistent" standard set forth in the *Inmarsat–P Order.* The proceeding on this application—in which COMSAT, its many would-be competitors, and the Departments of Commerce and State are participating—is currently on-going.

## II.

■ COMSAT contends that the Commission's *Inmarsat–P Order,* which has caused COMSAT to file its 1995 application as it did, did not honor Congress' clearly expressed intent that COMSAT participate in *any* and *all* Inmarsat activities. COMSAT believes the Maritime Satellite Act's frequent use of the term "maritime" indicates nothing more than Congress' recognition of the initial focus of the Inmarsat organization, and it argues that no portion of the Act which obliges or permits COMSAT to do anything is limited to that concept. Worse yet, the Commission's order prevents COMSAT from discharging the treaty obligations of the United States. Capital outlays are required of In-

---

**3.** The Commission had previously permitted COMSAT to provide through Inmarsat aeronautical services as well as non-North American landmobile satellite services under the "ancillary to and supportive of" standard.

**4.** In this regard, we are told that COMSAT owns the National Basketball Association's Denver Nuggets.

marsat signatories without limitation to maritime services—capital outlays that COMSAT may now be prevented from making under the FCC's order. And, COMSAT asserts, the United States agreed in the Inmarsat convention to designate a signatory capable of fulfilling all of the United States' obligations under the convention; the FCC may not by administrative fiat hinder the signatory in fulfilling these obligations.

The Commission responds to COMSAT's arguments on the interpretation of the Act, but the Commission also argues that the *Inmarsat–P Order* is not ripe for review. We therefore are obliged to deal first with this jurisdictional argument. The Commission notes that it has not acted on the COMSAT application for participation in Inmarsat–P—filed after the *Inmarsat–P Order.* The more extensive record that would be developed in a proceeding on the application would, the FCC asserts, provide a better context within which to decide whether its order comported with the relevant statutes. The Commission points out that if the application is denied, COMSAT retains the ability to raise the claims that it brings before us now, as well as any others that may arise later. If, instead, the application is granted, then a decision on the question we are asked to address today—whether the Commission may prohibit COMSAT from providing Inmarsat–P services *through Inmarsat*—may be unnecessary or at least premature.

COMSAT responds, naturally, that the *Inmarsat–P Order* is ripe for review. The question it presents is a purely legal one involving the authority of the Commission under the Act, and nothing more can be gained from further proceedings. We should decide now whether the Commission may prevent COMSAT from participating in Inmarsat activities just because they are not sufficiently maritime in character. The question in the application proceeding, on the other hand, is whether ICO has been structured as a sufficiently *non*-Inmarsat entity to pass muster under the *Inmarsat–P Order.* No matter what happens with that application, therefore, COMSAT's fundamental dispute with the *Inmarsat–P Order*—that the FCC had no authority to limit COMSAT's

participation in *any* Inmarsat venture—will not be mooted. If we do not review the *Inmarsat–P Order,* it will cast a pall over COMSAT's efforts to put together the Inmarsat–P system and will foreclose a variety of arrangements that COMSAT, in its efforts to keep up with the satellite Joneses, would otherwise explore and enjoy freely.

■ With ripeness the issue, we start, as always, with *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), the two cases issued the same day that mark off the boundaries of the ripeness doctrine. In general terms, we ask whether the issue before us is fit for judicial decision, and if that is uncertain, we consider the hardship to the petitioner of withholding a decision on the merits. *Mississippi Valley Gas Co. v. FERC,* 68 F.3d 503, 509 n. 4 (D.C.Cir.1995). The key distinction between *Abbott Laboratories*—where the case was determined to be ripe—and *Toilet Goods*—determined not to be ripe—was whether the regulations at issue affected the "primary conduct" of the petitioner, meaning, as the Court put it in *Toilet Goods,* "when contracts must be negotiated, ingredients tested or substituted, or special records compiled." *Toilet Goods,* 387 U.S. at 164–65, 87 S.Ct. at 1524–25; *see also Abbott Laboratories,* 387 U.S. at 153–54, 87 S.Ct. at 1517–18.

The only primary conduct affected by the *Inmarsat–P Order* that we can divine is COMSAT's participation in the structuring of ICO and its filing of the May 1995 application. That conduct is completed. And COMSAT candidly admits that even if we decided the legal issue presented to us in its favor, it would not seek the restructuring of ICO nor withdraw its application and submit another in reliance on our decision. COMSAT can only suggest that even if its 1995 application is granted, an order of this court disapproving of the Commission's construction of the statute will have some imprecisely described impact on COMSAT's follow-on activities. Although petitioner indicates that future contracts will be affected—thus invoking the magic words from *Toilet Goods*—it does not explain what sort of contracts or

why or how they may be affected. Under these circumstances, petitioner's contention that its issue is a "purely legal one" and therefore fit for judicial review, is beside the point. Unless we can determine that our opinion would have a concrete impact on a live dispute between the parties, we would be issuing an advisory opinion. We are certain that COMSAT must have a good practical reason for litigating and seeking to resolve its legal issue now, but we confess that we do not perceive it, and therefore surmise that it is simply not the sort of interest that presents us with jurisdiction. Paradoxically, a challenge to the Commission's declaratory order may well have been ripe if it reached us before COMSAT filed an application purportedly in compliance with the order. Still, COMSAT elected to file the application and did not seek expedition of its appeal. In that respect, its dispute with the Commission over statutory construction—at least as COMSAT focuses on the declaratory order—may be as much moot as unripe.

Looking ahead to the Commission's treatment of COMSAT's May 1995 application, it seems that there are at least two likely scenarios. One is that ICO is determined to be a non-Inmarsat activity and COMSAT's application is granted. In that case it is doubtful that COMSAT would have standing to object to the Commission's interpretation of the statute on the "ancillary to and supportive of" question under our precedents foreclosing petitions for review of favorable agency actions based on disagreement with agency reasoning. *See City of Cleveland v. NRC*, 68 F.3d 1361, 1370 (D.C.Cir.1995); *but compare Synovus Financial Corp. v. Board of Governors*, 952 F.2d 426, 432 (D.C.Cir. 1991), *with id.*, 952 F.2d at 440–42 (dissent). But even if COMSAT does not have standing, Motorola or another competitor of COMSAT might petition for review of the Com-

mission's grant of the application. In light of its disagreement with the Commission's interpretations permitting COMSAT to partake of even ancillary activities, Motorola may contend that COMSAT is prohibited from providing the proposed non-maritime service—even structured as it is—because it still has a relationship with Inmarsat.[5] The statutory interpretation issue put to us today may then be presented from a different angle. If COMSAT's application is denied, however, it could be expected that COMSAT would petition for review—and it seems likely that it would challenge the Commission's determination that, under the statute, COMSAT was limited in its Inmarsat activities to matters ancillary to maritime. At that time, one would hope a reviewing court would have the benefit of the government's participation in the application proceeding and presumably its position on review.

Suffice it to say then—and petitioner does not dispute this point—any issue arising out of the 1995 application is clearly premature. We think the banked, if smoldering, dispute between all of the parties over the construction of the statute has been channeled into that application proceeding. It seems probable that it will break out again in some form when the Commission acts on the application; until that time, however, the dispute is simply not ripe for judicial resolution.

\*    \*    \*    \*    \*    \*

Accordingly, the petition for review is

*Dismissed.*

---

**5.** In the *Inmarsat–P Order,* the Commission described the ICO arrangement as providing for 15% ownership of ICO by Inmarsat, and for 70% ownership by Inmarsat and its signatories collec-

tively. *Inmarsat–P Order* at 7696. The Commission notes that COMSAT's May 1995 application appears to incorporate, at least in broad strokes, much of the pre-*Inmarsat–P Order* ICO structure.